1  MATTHEW P. LEWIS (SBN: 155516)
   WHITE & CASE LLP
2  633 W. Fifth Street, Suite 1900
   Los Angeles, California 90071
3  Telephone: 213-620-7700
   Facsimile: 213-452-2329
4  Email:    mlewis@whitecase.com

5  KEVIN X. MCGANN [pro hac vice applicant]
   JAMES S. TRAINOR, JR. [pro hac vice applicant]
6  ROBERT E. COUNIHAN [pro hac vice applicant]
   WHITE & CASE LLP
7  1155 Avenue of Americas
   New York, New York 10036
8  Telephone:  212-819-8200
   Facsimile:  212-354-8113
9  Email:    kmcgann@whitecase.com
   Email:    jtrainor@whitecase.com
10 Email:    rcounihan@whitecase.com

11 WARREN S. HEIT (SBN: 164658)
   WHITE & CASE LLP
12 3000 El Camino Real
   5 Palo Alto Square, 9th Floor
13 Palo Alto, California 94306
   Telephone:  650-213-0300
14 Facsimile:  650-213-8158
   Email:  warren.heit@whitecase.com
15

16 Attorneys for Plaintiff
   GOOGLE INC.
17

FILED
CLERK, U.S. DISTRICT COURT

FEB 1 3 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY

18

## IN THE UNITED STATES DISTRICT COURT

19

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

20

| | |
|---|---|
| 21  GOOGLE INC., | Case No. SACV13-254-CJC (JPR) |
| 22           Plaintiff, | |
| 23        v. | **COMPLAINT FOR PATENT INFRINGEMENT** |
| 24  BT AMERICAS, INC.; BT | |
| 25  CONFERENCING, INC.; BT INS, INC.; and IPANEMA TECHNOLOGIES | **[JURY TRIAL DEMANDED]** |
| 26  CORPORATION, | |
| 27           Defendants. | |

28

- 1 -

## COMPLAINT FOR PATENT INFRINGEMENT

For its Complaint against Defendants BT Americas, Inc. ("BT Americas"), BT Conferencing, Inc. ("BT Conferencing"), BT INS, Inc. ("BT INS") and Ipanema Technologies Corporation ("Ipanema"), (collectively, "Defendants"), Plaintiff Google Inc. ("Google") alleges as follows:

## NATURE OF THE ACTION

1.       This is an action for patent infringement under the patent laws of the United States, Title 35 of the United States Code.  Google seeks remedies for Defendants' infringement of Google's U.S. Patent Nos. 5,581,703 (the "'703 patent"), 5,701,465 (the "'465 patent"), 6,807,166 (the "'166 patent"), and 7,460,558 (the "'558 patent") (collectively, the "Asserted Patents").

## THE PARTIES

2.       Plaintiff Google is a corporation organized and existing under the laws of the State of Delaware, having a place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

3.       Upon information and belief, Defendant BT Americas is a corporation organized under the laws of the State of Delaware, having places of business at: 234 Rangely Court, Simi Valley, CA 93065; 2160 E Grand Avenue, El Segundo, CA 90245; 1600 State Street, Santa Barbara, CA 93101; and 2020 Santa Monica Boulevard, Santa Monica, CA 90404.

4.       Upon information and belief, Defendant BT Conferencing is a corporation organized under the laws of the State of Delaware, having a place of business at 3500 Barranca Parkway, Irvine, CA 92606.

5.       Upon information and belief, Defendant BT INS is a corporation organized under the laws of the State of Delaware, having places of business at: 23600 El Toro Road, Suite D, Lake Forest, CA 92630; 20969 Ventura Boulevard, Woodland Hills, CA 91364; 28950 Oak Creek Lane, Apartment 1809, Agoura Hills, CA 91301; and 18759 Fairfield Road, Porter Ranch, CA 91326.

- 2 -

1    6.    Upon information and belief, Defendant Ipanema is a

2    corporation organized under the laws of the State of Delaware, having a place of

3    business at 1536 W. 25th Street, #266, San Pedro, CA 90732.

4    **JURISDICTION AND VENUE**

5    7.    This is an action for patent infringement arising under the patent

6    laws of the United States, Title 35, United States Code.  This Court has subject

7    matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

8    8.    This Court has personal jurisdiction over BT Americas by virtue

9    of, inter alia, its presence in California, having established minimum contacts with

10    the forum, having conducted business within the State of California and this

11    judicial District, and having engaged in systematic and continuous contacts with the

12    State of California.  On information and belief, BT Americas, directly and/or

13    through its subsidiaries, affiliates, and/or related entities, including BT

14    Conferencing, BT INS, and Ipanema, markets, distributes, offers for sale or license,

15    and/or sells or licenses (1) Quality of Service ("QoS") products and services as

16    software applications and/or related services under at least the names "BT

17    Wholesale Web Application QoS," "BT Wholesale Broadband Managed Connect

18    Shared," and "Application Optimization Service" ("AOS") (collectively, the "QoS

19    Services"), and (2) "OneVoice" and Unified Communication & Collaboration

20    ("UCC") products, including software applications and/or related services, which

21    utilize gateways for internet telephone systems that manage calls to and from

22    personal computers and enable personal computers to use the internet telephone

23    system with an internet protocol ("IP") address, assigned by a Dynamic Host

24    Configuration Protocol ("DHCP") server or a private IP address (collectively, the

25    "OneVoice/UCC Services") in the United States.  On further information and

26    belief, BT Americas directly and/or through its subsidiaries, affiliates, and/or

27    related entities markets, distributes, offers for sale or license, and/or sells or licenses

28    QoS Services and OneVoice/UCC Services in the State of California.  On further

- 3 -

COMPLAINT FOR PATENT INFRINGEMENT

1  information and belief, BT Americas has committed acts of infringement of one or

2  more claims of the Asserted Patents in this District.

3          9.    This Court has personal jurisdiction over BT Conferencing by

4  virtue of, inter alia, its presence in California, having established minimum contacts

5  with the forum, having conducted business within the State of California and this

6  judicial District, and having engaged in systematic and continuous contacts with the

7  State of California.  On information and belief, BT Conferencing, directly and/or

8  through its subsidiaries, affiliates, and/or related entities, including BT Americas

9  and BT INS, markets, distributes, offers for sale or license, and/or sells or licenses

10  OneVoice/UCC Services in the United States.  On further information and belief,

11  BT Conferencing, directly and/or through its subsidiaries, affiliates, and/or related

12  entities markets, distributes, offers for sale or license, and/or sells or licenses

13  OneVoice/UCC Services in the State of California.  On further information and

14  belief, BT Conferencing has committed acts of infringement of one or more claims

15  of the Asserted Patents in this District.

16          10.   This Court has personal jurisdiction over BT INS by virtue of,

17  inter alia, its presence in California, having established minimum contacts with the

18  forum, having conducted business within the State of California and this judicial

19  District, and having engaged in systematic and continuous contacts with the State

20  of California.  On information and belief, BT INS, directly and/or through its

21  subsidiaries, affiliates, and/or related entities, including BT Americas, BT

22  Conferencing, and Ipanema markets, distributes, offers for sale or license, and/or

23  sells or licenses (1) QoS Services under at least the names "BT Wholesale Web

24  Application QoS," "BT IPstream Connect Advanced," "BT Wholesale Broadband

25  Connect Assured," "BT Wholesale Broadband Managed Connect Shared," and

26  "AOS," and (2) OneVoice/UCC Services in the United States.  On further

27  information and belief, BT INS, directly and/or through its subsidiaries, affiliates,

28  and/or related entities distributes, offers for sale or license, and/or sells or licenses

- 4 -

1    QoS Services and OneVoice/UCC Services in the State of California.  On further

2    information and belief, BT INS has committed acts of infringement of one or more

3    claims of the Asserted Patents in this District.

4           11.    On information and belief, BT INS merged into BT Americas on

5    March 31, 2012.

6           12.    This Court has personal jurisdiction over Ipanema by virtue of,

7    inter alia, its presence in California, having established minimum contacts with the

8    forum, having conducted business within the State of California and this judicial

9    District, and having engaged in systematic and continuous contacts with the State

10    of California.  On information and belief, Ipanema, directly and/or through its

11    subsidiaries, affiliates, and/or related entities, including BT Americas and BT INS,

12    markets, distributes, offers for sale or license, and/or sells or licenses "Autonomic

13    Networking System" appliances and Scalable Application-Level Service

14    Architecture ("SALSA") products (collectively, the "ANS Products") in the United

15    States.  On further information and belief, Ipanema, directly and/or through its

16    subsidiaries, affiliates, and/or related entities markets, distributes, offers for sale or

17    license, and/or sells or licenses ANS Products in the State of California.  On further

18    information and belief, Ipanema has committed acts of infringement of one or more

19    claims of the Asserted Patents in this District.

20           13.    On information and belief, BT Group plc is the ultimate parent

21    of BT Americas, BT Conferencing, BT INS, and Ipanema.  On further information

22    and belief, BT Americas, BT Conferencing, BT INS, and Ipanema together and

23    with BT Group plc work together to promote, sell, use and provide and/or jointly

24    sell and provide QoS Services, OneVoice/UCC Services, and/or ANS Products as

25    set forth for example in paragraphs 8-12 above and paragraphs 19-42 below.

26    Accordingly, joinder of the parties is proper pursuant to 35 U.S.C. § 299(a) as: (1)

27    the right to relief is asserted against the parties jointly, severally, or in the

28    alternative with respect to or arising out of the same, transaction, occurrence, or

- 5 -

1    series of transactions or occurrences relating to the making, using, importing into

2    the United States, offering for sale, or selling of the same accused products or

3    processes; and (2) questions of fact common to all defendants will arise in this

4    action.

5         14.    Venue is proper in this District, pursuant to 28 U.S.C. §§ 1391

6    and 1400(b).

### THE ASSERTED PATENTS

### The '703 Patent

9         15.    On December 3, 1996, the United States Patent and Trademark

10   Office ("USPTO") issued U.S. Patent No. 5,581,703, entitled "Method and

11   Apparatus for Reserving System Resources to Assure Quality of Service."  Google

12   holds all right, title and interest in and to the '703 patent.  A copy of the '703 patent

13   is attached hereto as **Exhibit A**.

### The '465 Patent

15        16.    On December 23, 1997, the USPTO issued U.S. Patent No.

16   5,701,465, entitled "Method and Apparatus for Reserving System Resources to

17   Assure Quality of Service." Google holds all right, title and interest in and to the

18   '465 patent.  A copy of the '465 patent is attached hereto as **Exhibit B**.

### The '166 Patent

20        17.    On October 19, 2004, the USPTO issued U.S. Patent No.

21   6,807,166 B1, entitled "Gateway for Internet Telephony."  Google holds all right,

22   title, and interest in and to the '166 patent.  A copy of the '166 patent is attached

23   hereto as **Exhibit C**.

### The '558 Patent

25        18.    On December 2, 2008, the USPTO issued U.S. Patent No.

26   7,460,558 B2, entitled "System and Method for Connection Capacity Reassignment

27   in a Multi-Tier Data Processing System Network."  Google holds all right, title, and

28

1    interest in and to the '558 patent.  A copy of the '558 patent is attached hereto as

2    **Exhibit D**.

3                          <u>**DEFENDANTS' BUSINESS IN THE UNITED STATES**</u>

4                 19.    Defendants offer, <u>inter</u> <u>alia</u>, enterprise communications services

5    and solutions to corporate customers throughout the United States, including in this

6    District.  Defendants offer these services in different forms.

7                 20.    In certain instances, one or more Defendants provide consulting

8    services to their U.S. customers, recommending and/or providing software,

9    hardware, and/or other infrastructure to customers (the "Consulting Services").

10                21.    In other instances, one or more Defendants actively manage, as

11   a sourced service provider, customers' communications networks and resources

12   (the "Managed Services").  In this way, Defendants directly facilitate the transfer of

13   communications data within customers' networks.

14                22.    Defendants, through at least BT Americas, operate a global

15   Multiprotocol Label Switching ("MPLS") telecommunications network

16   infrastructure, which includes 20 MPLS nodes in the United States, and offer

17   Consulting and Managed Services to over 1,000 customers throughout the United

18   States and Canada.

19                23.    In connection with both the Consulting and Managed Services,

20   Ipanema offers software, hardware, and/or other infrastructure directly and/or

21   through BT Americas or BT INS, as the case may be.

22                24.    Defendants, through at least BT Americas and BT INS, offer

23   Consulting and Managed Services for traffic and bandwidth management of

24   customers' networks, including QoS Services.

25                25.    Defendants, through at least BT Americas, BT Conferencing

26   and BT INS, offer Consulting and Managed Services for customers' use of Voice

27   over Internet Protocol ("VoIP"), including  OneVoice/UCC Services.

28

- 7 -

COMPLAINT FOR PATENT INFRINGEMENT

## FIRST CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 5,581,703

26.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1- 25 of this Complaint.

27.    Defendants' QoS Services include services in furtherance of optimizing the transfer of files to remote nodes within a network and to other networks under a QoS standard guided by and/or employing the determination of the available bandwidth within a network and for the corresponding reservation of any such available bandwidth for transfer of a requested file. Defendants BT Americas and BT INS sell such QoS Services as software applications and/or related services under at least the names "BT Wholesale Web Application QoS," and "BT Wholesale Broadband Managed Connect Shared" (collectively, and together with any functional equivalents, the "BT '703 Accused Products and Services").

28.    At least by their offering as part of their Managed Services, Defendants BT Americas and BT INS have infringed and continue to infringe one or more claims of the '703 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, selling and/or importing products and services, including the BT '703 Accused Products and Services, without authorization, in this District and elsewhere in the United States, in violation of 35 U.S.C. § 271, including, but not limited to, 35 U.S.C. § 271(a).

29.    The infringement of the '703 patent by Defendants BT Americas and BT INS has caused and continues to cause damage to Google in an amount to be determined at trial. The infringement by Defendants BT Americas and BT INS has caused and continues to cause severe and irreparable harm to Google for which there is no adequate remedy at law, unless enjoined by this Court.

## SECOND CLAIM FOR RELIEF

## INFRINGEMENT OF U.S. PATENT NO. 5,701,465

30.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-29 of this Complaint.

31.    Defendants' QoS Services include services in furtherance of optimizing the transfer of files to remote nodes within a network and to other networks under a QoS standard guided by and/or employing the determination of the available bandwidth within a network and for the corresponding reservation of any such available bandwidth for transfer of a requested file. Defendants BT Americas and BT INS sell such QoS Services as software applications and/or related services under at least the names "BT Wholesale Web Application QoS," "BT IPstream Connect Advanced," "BT Wholesale Broadband Connect Assured," and "BT Wholesale Broadband Managed Connect Shared" (collectively, hereafter, and together with any functional equivalents, the "BT '465 Accused Products and Services").

32.    At least by their offering as part of their Managed Services, Defendants BT Americas and BT INS have infringed and continue to infringe one or more claims of the '465 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, selling and/or importing products and services, including the BT '465 Accused Products and Services, without authorization, in this District and elsewhere in the United States, in violation of 35 U.S.C. § 271, including, but not limited to, 35 U.S.C. § 271(a).

33.    The infringement of the '465 patent by BT Americas and BT INS has caused and continues to cause damage to Google in an amount to be determined at trial. The infringement by BT Americas and BT INS has caused and continues to cause severe and irreparable harm to Google for which there is no adequate remedy at law, unless enjoined by this Court.

- 9 -

COMPLAINT FOR PATENT INFRINGEMENT

## THIRD CLAIM FOR RELIEF

### INFRINGEMENT OF U.S. PATENT NO. 6,807,166

34.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-33 of this Complaint.

35.    Defendants' OneVoice/UCC Services include VoIP services employing an IP-telephone gateway that functions as a LAN receiver and transmitter and has a registry table that maps IP addresses with corresponding telephone numbers (collectively, hereafter, and together with any functional equivalents and any BT products or services that include, utilize or contain such services, the "BT '166 Accused Products and Services").

36.    At least by their offering as part of their Managed and/or Consulting Services, Defendants BT Americas, BT Conferencing and BT INS have infringed and continue to infringe one or more claims of the '166 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, selling and/or importing products and services, including the BT '166 Accused Products and Services, without authorization, in this District and elsewhere in the United States, in violation of 35 U.S.C. § 271, including, but not limited to, 35 U.S.C. § 271(a).

37.    The infringement of the '166 patent by Defendants BT Americas, BT Conferencing and BT INS has caused and continues to cause damage to Google in an amount to be determined at trial. The infringement by Defendants BT Americas, BT Conferencing and BT INS has caused and continues to cause severe and irreparable harm to Google for which there is no adequate remedy at law, unless enjoined by this Court.

## FOURTH CLAIM FOR RELIEF

### INFRINGEMENT OF U.S. PATENT NO. 7,460,558

38.    Plaintiff realleges and incorporates by reference the allegations of paragraphs 1-37 of this Complaint.

39.    Defendants' QoS Services include services in furtherance of prioritizing and/or reassigning connection capacity between prioritized connection classes in a multi-tiered network system.  Defendants BT Americas and BT INS sell such QoS Services as software applications and/or related services under at least the name "AOS" (the "AOS Services").  Ipanema offers its ANS Products to third parties, including to BT Americas and BT INS, for integrated use with the AOS Services offered by Defendants BT Americas and BT INS (collectively, with the AOS Services, and together with any functional equivalents, the "BT '558 Accused Products and Services").

40.    At least by their offering as part of their Managed Services, Defendants BT Americas and BT INS have infringed and continue to infringe one or more claims of the '558 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, selling and/or importing products and services, including the BT '558 Accused Products and Services, without authorization, in this District and elsewhere in the United States, in violation of 35 U.S.C. § 271, including, but not limited to, 35 U.S.C. § 271(a).

41.    At least by their offering of ANS Products as a component of third party systems, including at least those offered by BT Americas and BT INS, Defendant Ipanema has infringed and continues to infringe one or more claims of the '558 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, selling and/or importing products and services, including the BT '558 Accused Products and Services, without authorization, in this District and elsewhere in the United States, in violation of 35 U.S.C. § 271, including, but not limited to, 35 U.S.C. § 271(c).

42.    The infringement of the '558 patent by Defendants BT Americas, BT INS, and Ipanema has caused and continues to cause damage to Google in an amount to be determined at trial. The infringement by Defendants BT Americas, BT INS, and Ipanema has caused and continues to cause severe and

- 11 -

1    irreparable harm to Google for which there is no adequate remedy at law, unless

2    enjoined by this Court.

3                              **PRAYER FOR RELIEF**

4            WHEREFORE, Google prays for a judgment in its favor and against

5    Defendants and respectfully requests the following relief:

6            A.    A judgment declaring that Defendants have directly infringed

7    one or more claims of each of the Asserted Patents at issue in this litigation,

8    pursuant to 35 U.S.C. § 271(a);

9            B.    A judgment pursuant to 35 U.S.C. § 271(e)(4)(B) preliminarily

10   and permanently enjoining Defendants, its officers, agents, servants and employees,

11   and those persons in active concert or participation with any of them, from

12   continued acts of infringement of the patents at issue in this litigation;

13           C.    A judgment requiring Defendants to pay Google its damages,

14   costs, expenses, and pre-judgment and post-judgment interest for Defendants'

15   infringement of each of the patents at issue in this litigation;

16           D.    A judgment finding that this is an exceptional case and awarding

17   Google attorneys' fees pursuant to 35 U.S.C. § 285; and

18           E.    Such other relief as the Court deems just and proper.

19

20

21   Dated:  February 13, 2013                WHITE & CASE LLP

22

23                                            By: _____
                                                  Matthew P. Lewis
24                                            Attorneys for Plaintiff
                                              Google Inc.

25

26

27

28

- 12 -

## **DEMAND FOR JURY TRIAL**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Google respectfully demands a jury trial of all issues triable to a jury in this action.

Dated:  February 13, 2013                                 WHITE & CASE LLP


By: _____
    Matthew P. Lewis
    Attorneys for Plaintiff
    Google Inc.

- 13 -

# EXHIBIT A

US005581703A

# United States Patent [19]

Baugher et al.

[11] Patent Number: 5,581,703

[45] Date of Patent: Dec. 3, 1996

[54] METHOD AND APPARATUS FOR RESERVING SYSTEM RESOURCES TO ASSURE QUALITY OF SERVICE

[75] Inventors: **Mark J. Baugher; Philip Y. Chang**, both of Austin; **Gregory L. Morris**, Round Rock; **Alan P. Stephens**, Austin, all of Tex.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **84,053**

[22] Filed: Jun. 29, 1993

[51] Int. Cl.$^6$ .................................................. G06F 13/14
[52] U.S. Cl. ............................... **395/200.06**; 395/200.12
[58] Field of Search ...................................... 395/200, 650; 455/17; 370/60, 14, 45, 85.1, 85.7

[56] References Cited

## U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,331,834 | 5/1982 | Ganz et al. ............................ 178/3 |
| 4,466,058 | 8/1984 | Girard et al. ......................... 395/304 |
| 4,539,679 | 9/1985 | Bux et al. . |
| 4,654,867 | 3/1987 | Labedz et al. ........................ 379/59 |
| 4,870,641 | 9/1989 | Pattavina . |
| 4,991,079 | 2/1991 | Dann . |
| 5,054,109 | 10/1991 | Blackburn ............................. 455/17 |
| 5,136,581 | 8/1992 | Muehrcke . |
| 5,187,787 | 8/1992 | Skeen et al. . |
| 5,231,631 | 7/1993 | Buhrke et al. ........................ 370/60 |
| 5,265,262 | 11/1993 | Grube et al. .......................... 455/17 |

## OTHER PUBLICATIONS

IBM TDB, "Method of Bandwidth Management by Dynamic Port Configuration", vol. 34, No. 7A, Dec. 1991, pp. 261–265.

IBM TDB, "Control Program for Multimedia Workstations", vol. 35, No. 4B, Sep. 1992, pp. 112–113.

IBM TDB, "Automated Accounting Storage Transaction Unit Methodology", vol. 35, No. 6, Nov. 1992, pp. 278–279.

IBM TDB, "Technique for Replicating Distributed Directory Information", vol. 33, No. 12, May 1991, pp. 113–120.

IBM TDB, "Inter–Client Resource Usage in Distributed Client–Server Presentation Manager System", vol. 34, No. 4B, Sep. 1991, pp. 416–417.

IBM TDB, "Method and Apparatus for the Statistical Multiplexing of Voice, Data, and Image Signals," vol. 35, No. 6, Nov. 1992, pp. 409–411.

IBM TDB, "Efficient, Real–Time Address Resolution in Backbone Networks of General Topology", vol. 36, No. 03, Mar. 1993, pp. 133–139.

*IEEE Journal on Selected Areas in Communications,* vol. 7, No. 5, Jun. 1989, "Packet Communication Protocol for Image Services on a High–Speed Multimedia LAN", M. Mera et al, pp. 782–788.

*Advanced Technology Group Apple Computer, Inc.,* 1991, "Desktop Multimedia Communications—Breaking the Chains", D. Blackketter et al, pp. 73–77.

*Lancaster University, UK,* "Resource Management in Multimedia Communication Stacks", A. Campbell et al, pp. 287–295, No date.

*IEEE Journal on Selected Areas in Communications,* vol. 8, No. 3, Apr. 1990, "A Scheme for Real–Time Channel Establishment in Wide–Area Networks", D. Ferrari et al, pp. 368–379.

(List continued on next page.)

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—Peter Y. Wang
*Attorney, Agent, or Firm*—Paul S. Drake; Volel Emile

[57]       **ABSTRACT**

A method for providing files to a remote node including the steps of determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, reserving bandwidth for the requested file if bandwidth is determined to be available, and opening the requested file for transmission only if bandwidth is reserved. In addition, an apparatus for providing files to a remote node including apparatus for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, apparatus for reserving bandwidth for the requested file if bandwidth is determined to be available, and apparatus for opening the requested file for transmission only if bandwidth is reserved.

**12 Claims, 9 Drawing Sheets**



EXHIBIT A

-14-

5,581,703
Page 2

## OTHER PUBLICATIONS

*IEEE Communications Magazine,* Nov. 1990, "Client Requirements for Real–Time Communications Services", D. Ferrari, pp. 65–72.

*Journal of Association for Computing Machinery,* vol. 20, No. 1, Jan. 1973 "Scheduling Algorithms for Multiprogramming in a Hard–Real–Time Environment", J. W. Layland et al, pp. 46–61.

*Globecom '89. IEEE Global Telecommunications Conference and Exhibition Communications Technology for the 1990s and Beyond,* "A Network Environment for Studying Multimedia Network Architecture and Control", R. Lake et al, pp. 1232–1236.

*1992 IEEE International Conference on Selected Topics in Wireless Communications. Conference Proceedings,* "Communications Requirements of Multimedia Applications: A Preliminary Study", T. Kwok, pp. 138–142.

*Technical Reference. Appendix E.,* "AVSS File Format", pp. E1–E33, No date.

*CIP Working Group,* Oct. 1990, "Experimental Internet Stream Protocol", Version 2 (ST–II), C. Topolcic—Editor, pp. 1–148.

*International Telegraph and Telephone Consulative Committe* (*CCITT* ), Period 1989–1992, "COM XI–R 133–E", Working Party XI/6, pp. 1–88.

*RZ 1463 (Log #53321) Apr. 25, 1986 Communications 24 pages: Research Report,* "Data/Voice Integration Based on the IEEE 802–5 Token–Ring LAN", F. Closs et al, pp. 1–24.

"Multimedia File Formats/Waveform Audio File Format (WAVE)", Chapter 8, pp. 40–45., No date.

EXHIBIT A

**U.S. Patent**      Dec. 3, 1996      Sheet 1 of 9        **5,581,703**



FIG. 1

EXHIBIT A

-16-



FIG. 2

EXHIBIT A

-17-



**FIG. 3**

EXHIBIT A                    -18-



FIG. 4



**FIG. 5**



**FIG. 6**

EXHIBIT A

-20-

U.S. Patent         Dec. 3, 1996         Sheet 6 of 9         5,581,703



FIG. 7A

FIG. 7B

EXHIBIT A                    -21-



FIG. 7C



FIG. 8



**FIG. 9A**

EXHIBIT A

-23-



**FIG. 9B**

EXHIBIT A

-24-

5,581,703

**1**

# METHOD AND APPARATUS FOR RESERVING SYSTEM RESOURCES TO ASSURE QUALITY OF SERVICE

## RELATED PATENT APPLICATIONS

Related patent applications include commonly assigned patent application U.S. Ser. No. 08/085,264 filed on the same date as the present application, entitled "SYSTEM AND METHOD FOR PROVIDING MULTIMEDIA QUALITY OF SERVICE SESSIONS IN A COMMUNICATIONS NETWORK", hereby incorporated by reference; commonly assigned patent application U.S. Ser. No. 08/085,274 filed on the same date as the present application, entitled "SYSTEM AND METHOD FOR BANDWIDTH RESERVATION FOR MULTIMEDIA TRAFFIC IN COMMUNICATIONS NETWORKS" now U.S. Pat. No. 5,388,097, hereby incorporated by reference; and commonly assigned copending patent application U.S. Ser. No. 08/085,275 filed on the same date as the present application, entitled "MULTIMEDIA RESOURCE RESERVATION SYSTEM", hereby incorporated by reference.

## TECHNICAL FIELD

The present invention relates to data processing systems and more particularly to data processing systems providing resource reservation to assure a desired quality of service.

## BACKGROUND ART

It has long been known to provide computer workstations interconnected by digital communication networks whereby users of the individual workstations may communicate with one another over the network for tasks such as file serving from a host or server to client computers. This has been previously common, for example, by means of a typed note, data or program file transmitted to another user. More recently, users have increasingly requested multimedia file services, desktop conferencing, remote presentations, and other multimedia applications between network users. However, such multimedia applications utilizing data-intensive sound, voice, and video flows require performance guarantees for high disk access and high bandwidth communication links between distributed computing systems with minimal communication delay, maximum throughput, and instantaneous burst communication capability. As a result, it has become very difficult to schedule appropriate resources to meet the requirements of such multimedia applications.

Prior art has recognized that certain data in a network, such as that associated with multimedia, may require priority handling. Thus, for example, a "quality of service" (QOS) or bandwidth has been defined in the literature. Quality of service or bandwidth seeks to describe various parameters which may be specified in an attempt to define certain minimum requirements which must be met for transmission of given data types over the network. See, for example, quality of service standards set forth in the OSI TP4 Open System Interconnect Standard X.214 and the quality of service standards defined in CCITTQ.931 (ISDN), Q.933 (frame relay), and Q.93B (B-ISDN ATM) drafts. As yet another example there is an architected priority mechanism in the IEEE 802.5 Token Ring. A station on the ring with a high priority frame to send may indicate this in an access control field of a passing frame. When a station sending the frame releases the token, it releases the token at the priority of the AC field, and eventually sets it back to its original priority as specified in an IEEE 802.5 medium

**2**

access control protocol. The IEEE standard and implementations thereof merely specify a protocol for increasing and decreasing priority. However, the user of such a service, such as a client-server file system, has to determine when service guarantees are needed for certain file accesses. For example, multimedia file reads for playing sound, voice, and video from a server to a client need certain quality of service guarantees.

Allocating resources when a connection is made between digital computers, such as for a client-server session, is known where memory is allocated to hold information related to the session. Buffers are also commonly reserved for file access on computers, such as on a server computer. Buffers may also be reserved on the client computer for multimedia file where a memory buffer must be large enough to store a reserve of file elements so that variations in delay between the server and client are absorbed. That is, there should be enough file elements stored in the memory buffer so that the buffer will not go empty during the playback of sound, voice or video. Otherwise, a glitch or jitter will occur causing a deterioration in the quality of a presentation. For example, if the maximum delay is two seconds and the multimedia flow averages 150 kilobytes per second, then a buffer at least 300 kilobytes in size is needed to preserve quality of service.

Many types of files contain information in their header useful for determining such quality of service parameters. Other types of files may require that the file be read, parsed or scanned to determine such quality of service parameters. However, in a general purpose client-server environment, a very large variety of file types and formats exist and a file server may not be programmed to determine quality of service parameters in all cases. In addition, an application program, running on a workstation in a client-server environment, may not recognize whether a file being accessed is located on the workstation or on a remote file server. If the file is located on the application program workstation, then quality of service is generally met. However, if the file being accessed is located on a remote server, then the file access must contend for server resources such as disk cycles or bandwidth, disk controller cycles, system bus resources, server processor resources, and network resources. As a result, it is difficult to maintain quality of service in a client-server environment for remote file accesses.

## DISCLOSURE OF THE INVENTION

A method for providing files to a remote node including the steps of determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, reserving bandwidth for the requested file if bandwidth is determined to be available, and opening the requested file for transmission only if bandwidth is reserved. In addition, an apparatus for providing files to a remote node including apparatus for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, apparatus for reserving bandwidth for the requested file if bandwidth is determined to be available, and apparatus for opening the requested file for transmission only if bandwidth is reserved.

A further understanding of the nature and advantages of the present invention may be realized by reference to the remaining portions of the specification and the drawings.

## BRIEF DESCRIPTION OF THE DRAWING

FIG. 1 is a block diagram of a typical data processing system utilized by a preferred embodiment of the invention;

EXHIBIT A

-25-

5,581,703

| 3 | 4 |

FIG. 2 is an illustration of a data processing system including three workstations interconnected by a network in accordance with the subject invention;

FIG. 3 is a block diagram illustrating a multilayered computer communication network model based upon the OSI layered reference model;

FIG. 4 is a block diagram of a preferred layered open systems interconnection model showing the relationship of components of the subject invention to the layers;

FIG. 5 is a flowchart illustrating initializing a host system with default quality of service parameters for types of files;

FIG. 6 illustrates a default table generated by the process described in FIG. 5;

FIGS 7A–7C are a flowchart illustrating a preferred method for individually determining quality of service parameters for files;

FIG. 8 is a block diagram of a reservation table utilized by the resource reservation system to handle resource reservations according to a preferred embodiment of the invention; and

FIGS. 9A–9B are a flowchart illustrating a preferred method for reserving a desired quality of service of various resources.

BEST MODE FOR CARRYING OUT THE
INVENTION

FIG. 1 is a block diagram of a typical data processing system 100 utilized by a preferred embodiment of the invention. The data processing system includes main processor(s) 110 coupled to a main memory 120 in computer box 105 with input device(s) 130 and output device(s) 140 attached. Main processor(s) 110 may include a single processor or multiple processors. Input device(s) 130 may include a keyboard, mouse, tablet or other types of input devices. Output device(s) 140 may include a text monitor, plotter or other types of output devices.

The main processor may also be coupled to graphics output device(s) 210 such as a graphics display through a graphics adapter 200. Graphics adapter 200 may be located in an adapter slot 160A. Graphics adapter 200 receives instructions regarding graphics from main processor 110 on bus 150, thereby rendering the desired graphics output from the main processor.

A communications adapter 250 such as a modem or a network adapter for networks such as token ring or ethernet may be located in slot 160C. The slot provides communications with main processor 110 across bus 150. Communications adapter 250 may communicate with other data processing systems 270 across communications line 260. As a result, the main processor may communicate with other data processing systems 270 via bus 150, slot 160C, communications adapter 250 and communications line 260.

A hard disk 255 may be located in slot 160D to provide additional memory for use by the main processor. Computer readable removable media 290, such as a magnetic diskette or a compact disc, may be inserted into an input/output device 285, such as a disk drive or a CD-ROM (compact disc—read only memory) drive. Data is read from or written to the removable media by the I/O device under the control of the I/O device controller 280. The I/O device controller communicates with the main processor through slot 160E across bus 150. Main memory 120, hard disk 255 and removable media 290 are all referred to as memory for storing data for processing by processor 110. One of the

preferred implementations of the present invention is as several sets of instructions in a code module resident in the main memory 120. Until required by the computer system, the sets of instructions may be stored in another computer memory, for example, in a hard disk drive, or in a removable memory such as an optical disk or floppy disk for eventual use in a CDROM or the floppy disk drive.

FIG. 2 illustrates a data processing system comprising a number of workstations (here, three workstations 300, 320, and 330) interconnected by a pair of data networks 310 and 340 (also referred to as communications links), so as to permit communication between the workstations (also referred to as nodes). It is assumed that the data processing shown in FIG. 2 is of a type which permits concurrent real-time communication between the users. The network operates according to a conventional network protocol, such as the token ring protocol described in *Token Ring Network Architecture* reference, SC30-3374, IBM, 1989.

FIG. 2 depicts only one possible hardware configuration for a data processing network. Other configurations are possible. For example, the data processing system could be based upon a star network, or a host processor connected to a plurality of dumb terminals, or could further be based upon a plurality of remote processors connected by a communication network. The networks could also be based upon the telephone network, and ISDN network, or any other "dial up" networks. Moreover, the workstations could be located within the single workspace or within a local area, or could be remote from one another. A source for detailing technical planning information for configuring a network of workstations in accordance with the invention, is the *IBM Extended Services for OS/2 Example Scenarios Manual*, 1991.

Multimedia computing is the processing of various media, such as video, waveform audio, musical instrument digital interface (MIDI) streams, animation, graphics, and text. Media processing includes the capture, authoring (editing) and playback of media streams as well as other data processing applications. Multimedia documents which are stored on some non-volatile medium, such as a disk, are referred to as recorded multimedia applications. There are also live multimedia applications in which two or more people communicate with each other at the same time using a computer. Live multimedia applications are normally conducted across space and time indicating that live multimedia is inherently distributed. Even recorded multimedia applications require distributed file system services to share large volumes of stored media, such as video disk, audio information, or computer-generated images. Thus, it is critical that a prioritizing scheme in accordance with the invention for multimedia applications includes support for a distributed environment.

To reduce design complexity, most networks are organized as a series of layers, each one built upon its predecessor as described in *Computer Networks*, Tannenbaum, Andrew S., Prentice Hall (1988) and *OSI, A Model for Computer Communications Standards*, Black, Ulyess, Prentice Hall, 1991. The number of layers, the name of each layer, contents, and function of each layer differ from network to network. However, in each network, the purpose of the layers is to offer certain services to the higher layers, shielding those layers from the details of how the offered services are actually implemented. The purpose, function, and details of each of the layers and their interaction is set forth in the previously noted references and is familiar to communication programmers ordinarily skilled in the art.

Priority assurance is an important factor in ensuring bandwidth or quality of service, and is enabled by operation

EXHIBIT A

5,581,703

| 5 | 6 |

of a component which may be implemented in hardware logic or software. The component regulates access to the priority queue or transmit channel that is attached to the shared medium local area network section. Access to the priority queue or transmit channel will pass through this component, thus subjecting all communication transactions to rejection or tracking by the component. A more detailed discussion of this component and the related station's bandwidth manager component are described in commonly assigned copending patent application U.S. Ser. No. 07/930, 587, filed Aug. 17, 1992, entitled "Network Priority Management" (IBM Docket No. AT9-92-089), hereby incorporated by reference.

FIG. 3 is a block diagram illustrating a multilayered computer communication network model based upon the OSI layered reference model. Further detail of this OSI and related IEEE models may be found in *OSI, A Model for Computer Communications Standards*, infra. A client system 20A is shown communicating with a server system 20B across a communications link 30. The seven layers of the OSI model for each system are shown as reference numerals 40–52. The lowest layer is physical layer 40A–40B which is responsible for implementing a physical circuit between data terminal equipment and data circuit terminating equipment.

A data link layer 42A–42B is responsible for transfer of data across the link. A network layer 44A–44B specifies the interface of the user into a network and also defines network switching/routing and communications between networks. A transport layer 46A–46B provides an interface between the data communications network and the upper three layers. This layer is of particular interest because it provides the user options in obtaining certain levels of quality, and is designed to keep the user isolated from some of the physical and functional aspects of the network. A session layer 48A–48B serves as a user interface into the transport layer below, providing a means for exchange of data between users such as simultaneous transmission, alternate transmission, checkpoint procedures and the like. The remaining two layers, a presentation layer 50A–50B and an application layer 52A–52B ensure that user applications can communicate with each other and further concern the support of the end-user application process. Please note that each of the client system layers is shown communicating with the corresponding server system layers. Although each of the layers perceives that these communications are direct, the communications are shown as dotted lines because the only direct communications are performed through the network.

It will be noted from FIG. 3 that there are other implementations in the art of such an OSI reference model bearing varying degrees of similarity thereto, a portion of one being depicted in the left part of FIG. 3 as the IEEE model, a physical layer 60 may be seen corresponding to the physical layer of the OSI model. The IEEE recognized a need to divide the data link layer into two sublayers in order to handle different link configurations and thus a medium access control (MAC) 62 and logical link control (LLC) 64 were provided for. The sublayer is protocol-specific (such as to a LAN such as Ethernet) whereas the LLC serves as an interface to an upper layer protocol, typically the network layer (and isolates the network layer from the specific actions of the MAC sublayer). One purpose of depicting varying forms of a multilayered computer communication network in FIG. 3 is to illustrate that the invention admits to implementations in any number of such multilayered models, and is thereby not intended to be limited to application to the OSI reference model emphasized in the description herein.

FIG. 4 is a block diagram of a preferred layered open systems interconnection model showing the relationship of components of the subject invention to the layers and to the data processing system. An application program 70 on a client system seeks a file to be accessed through a file system application program interface (API) 72 to a redirector 74. If the file is not located on the client system, then the redirector determines which remote system, such as the server system, has the desired file. If the file is located on the client system, then the file is accessed on a local file system not shown. If the file is located on the server system, then the redirector passes a request for access to the desired file to the server system through a communications transport 76 (such as netbios or TCP/IP) to a network adapter device driver 78. The network device driver then sends the request to the server system through a network adapter 79 across a communications link 80 (such as ethernet or token ring) to the server system network adapter 99 and network adapter device driver 98. The network adapter device driver then passes the request on to the communications transport 96. The communications transport then passes the request on to a high performance file system (HPFS) 94. The high performance file system then passes the file request onto a resource reservation system (RRS) 92. The resource reservation system then determines whether there are any quality of service parameters for the requested file. If not, then the resource reservation system so notifies the high performance file system. The high performance file system then accesses the file on a local disk drive not shown. If the resource reservation system determines that there are quality of service parameters for the requested file, then the resource reservation system then automatically reserves the appropriate resources to ensure that the quality of service for the file is maintained.. This process will be described in detail below. The resource reservation system so notifies the high performance file system. The high performance file system then opens and accesses the file through a local file system to a local disk drive. Access to the file is then provided to the requesting application program, with quality of service guarantees if established, and the application program is so notified. This notification occurs through communications transport 96, network device driver 98, network adapter 99, communications link 80, network adapter 79, network device driver 78, communications transport 76, redirector 74, and file system API 72. Please note that the elements of the client and server systems are shown corresponding to layers of the OSI model described above. In addition, the elements of the client and host systems correspond to the elements of the data processing system described above. Elements 70–78 reside in memory of the client system and are executed by the client system processor. Network adapters 79 and 99 are communications adapters for the client and hosts systems respectively. In addition, portions of the network adapter device drivers may reside on and be executed by the network adapters. Communications link 80 may be a network such as Ethernet or Token ring. Elements 92–98 reside in memory of the host system and are executed by the host system processor.

This system allows for easy access to the files across a network and also provides the capabilities for an automatic resource reservation system as will be described below.

Determining Quality of Service Parameters

There are many types of quality of service parameters known in the art. The parameters of particular interest to a preferred embodiment of the invention are throughput, burst, and delay. Throughput is the average amount of information passed through the communications link in a given period of

5,581,703

| 7 | 8 |

time such as 150 kilobytes per second. Burst is the maximum amount of information passed through the communications link in a short period of time. Delay is the maximum amount of delay that can be tolerated, typically due to buffer size in relation to throughput.

Default quality of service parameters may be provided for files for types of files. That is, files are typically stored as XXXXXX.YYY where .YYY is the extension of the file. The extension typically describes the type of the file (e.g. .VOC for a voice file and .WAV for a wave file). These default values may be provided

FIG. 5 is a flowchart illustrating initializing a host system with default quality of service parameters for types of files. In step 350, the user provides to the high performance file system (HPFS) a quality of service (QOS) file listing file types and quality of service parameters for each file type. The user may provide this QOS file in a variety of ways. A soft copy of a QOS file may be provided with a bet of multimedia files by a vendor and provided therewith for installation by the user or the vendor may provide a software tool for the user to use to create the QOS file. In addition, the user may respond to a set of queries from the host system. In step 360, the first entry in the QOS file is read. In step 370, if end of file is not reached, then processing continues to step 380. In step 380, a description of the file type and its quality of service parameters are extracted from the record and added to a default table in memory. FIG. 6 illustrates a default table 392 generated by the process described in FIG. 5. The default table may include values for file type 393, throughput 394, burst 395, and delay 396. Processing then returns to step 360 to read the next record in the QOS file. If end of file is reached in step 370, then the default table containing the file types and quality of service parameters are provided to the resource reservation system (RRS) for later use as will be described below.

FIGS. 7A–7C are a flowchart illustrating a preferred method for individually determining quality of service parameters for files. There are many types of files which may require quality of service and it is preferable to obtain the quality of service parameters for an individual file when that file is transferred to the host computer for storage on the host computer. This individual determination of quality of service parameters for files may be performed automatically for certain types of files such as voice (VOC), wave (WAV), audio-visual (AVI), or other types of multimedia files. These quality of service parameters may also be obtained by querying the operator as the files are transferred and stored in the host computer. In an alternative embodiment, the quality of service parameters may be determined when a file is first used or at each use of a file. In another alternative embodiment, the quality of service parameters may be determined for an application by accumulating the quality of service parameters of each file to be accessed by the application.

In step 400, the file is transferred to the host computer for storage. The host computer may receive the file from an external media such as a CD-ROM or floppy disk, or from another data processing system across a communications adapter. In step 405, it is determined whether quality of service parameters are to be calculated for the transferred file. The user may request calculation of quality of service parameters by using a particular command to transfer the file to the host system. In addition, the host system may automatically calculate quality of service parameters for certain types of files. If no parameters are to be calculated, then processing ends. Otherwise, in step 410, a quality of service calculation utility may be executed to determine the quality

of service parameters for the file. This utility may be executed, at the request of the user storing the file on the host system or the utility may be automatically executed for certain types of predesignated files. In step 420 the extension of the file is obtained. That is, files are typically stored as XXXXXX.YYY where .YYY is the extension of the file. The extension typically describes the type of the file (e.g. .VOC for a voice file and .WAV for a wave file). Multimedia files are preferably distinguished into two types, fixed sample or variable sample. Fixed sample files have fixed length sample records and may include a header record describing the records. An example of a fixed sample file is a voice (VOC) file which typically has a header followed by a number of contiguous bytes, each byte being an eight sample. The header provides information about the sampling rate (e.g. 8000, 11000 or 44000 samples per second) and the number of channels (e.g. one for mono, two for stereo, more than two for multichannel). Variable sample files have variable length sample records and require greater processing to determine quality of service parameters according to the preferred embodiment of the invention. An example of a variable sample file is a digital video interactive (DVI) file which has a series of reference frames with two or more delta frames interspersed between each pair of reference frames. The size of the delta frames depends on the amount of movement occurring between reference frames. In step 430, based on the extension, if the file is a fixed sample file then processing continues to the flowchart of FIG. 7B. If the file is a variable sample file, then processing continues to the flowchart of FIG. 7C.

Once the quality of service parameters are obtained, then in step 440, the quality of service parameters are preferably stored as extended attributes of the file. That is, many operating systems such as OS/2 (trademark of International Business Machines Corp.) have the capability of storing and retrieving extended attributes for any file without requiring the file be opened. Extended attributes are described in detail in the *OS/2 2.0 Technical Library, Programming Guide,* Volume 1, Version 2.00, hereby incorporated by reference. As a result, the extended attributes may be accessed to determine whether appropriate resources are available for utilizing the .file prior to opening the file. In alternative embodiments, the quality of service parameters may be stored in the file or may be stored in a table with reference to the file. If the quality of service parameters are determined each time the file is used, then the parameters do not need to be stored.

FIG. 7B is a flowchart illustrating a preferred method for determining quality of service parameters for fixed sample files (that is, files that have fixed length records for each sample and typically have a header record describing the records). In step 500, the file header is read. If a file header is not available, then the first record in the file is read. In step 510, information for determining quality of service is extracted from the file header or the first record. For fixed sample records, the number of concurrent channels or data streams, the frequency of sampling data, and the sample size are extracted from the file.

In step 520, the quality of service parameters are calculated from the information obtained from the file. These parameters are determined for reading the files. However, the parameters could also be determined for writing to the files. The quality of service parameters typically determined are read throughput and burst. Throughput is the average number of bits or bytes needed to transmit per second in order to provide realtime use of the data. Factors includes the number of channels (mono, stereo or multi-

EXHIBIT A

-28-

5,581,703

**9**

channel), the sampling frequency, and the sample size. For example, the throughput would be equal to the number of data streams times the sample frequency times the sample size. That is, a stereo signal with a sample rate of 44 kilohertz with a sample size of 16 bits per sample may be utilized for compact disk quality music file for a throughout of 176 kilobytes per second. In addition, other QOS parameters such as burst, minimum data throughput, maximum data throughput, or other measures may be calculated. Burst is the amount of data typically transmitted in a short time interval. Other possible parameters could be determined including various measures of dispersion for variable sample files. For example, a throughput average and a throughput standard deviation could be determined. These parameters are determined by determining the amount of data to be transmitted. Processing then returns to FIG. 7A where the parameters are then stored as extended attributes of the file.

FIG. 7C is a flowchart illustrating a preferred method for determining quality of service parameters for variable sample files (that is, files that have fixed length records for each sample and typically have a header record describing the records).

In step 600, the file header and file trailer are read if available. In step 610 the number of frames in the file of video is determined from information in the header or trailer. In step 620, the frame rate is also determined based on information in the header or trailer of the file. For example, NTSC (National Television Standard Committee) signals are 29.97 frames per second and PAL television signals are 25 frames per second. In step 630 the first frame of the file is read. In step 640 the number of bytes in the frame is calculated and stored. In step 650 it is determined whether this is the last frame in the file. If no, then processing returns to step 630 to read the next frame and extract information from that frame. If yes, then in step 660, the various quality of service parameters are calculated including throughput and burst. Processing then returns to FIG. 7A where in step 450, the quality of service parameters are then stored as extended attribute of the file.

Determining Network Capacity

Before reservation of resource capacity is performed, it is preferable that the amount of that capacity be determined for the various types of networks and other resources that may be reserved. Resource capacity may easily be obtained by querying the operator of the system. However, the operator may not know the capacity or the capacity may vary since the operator was queried. For example, a network may be slowed by more clients being added to the network, thereby increasing network overhead. Resource capacity may also be determined by determining what resources are available. For example, the host system may detect what resources are on the system during initial program load (sometimes referred to as sniffing). The host system may then compare the resources detected to a table listing capacities for all types of resources to determine what the resource capacity is. Resource capacity may also be determined by running some benchmarking tools to detect what the actual capacity of the resources are. For example, a series of reads and writes to a disk drive to determine its capacities.

Reserving Quality of Service

FIG. 8 is a block diagram of a reservation table 800 utilized by the resource reservation system to handle resource reservations according to a preferred embodiment of the invention. The reservation table includes a listing of each resource 810, its location 820, and its capacities 830 that are available for reservation. The reservation table also

**10**

includes a variable number of reservations 840 for each resource. For example, an ethernet adapter located in adapter slot #1 has a capacity of 2 megabytes per second and has two reservations of that capacity.

FIGS. 9A–9B are a flowchart illustrating a preferred method for reserving a desired quality of service of various resources. This reservation process is preferably performed for desired files, typically multimedia or other types of files requiring uninterrupted service, as those files are opened. However, the below described process may also be utilized for providing quality of service for desired sessions or applications. The below processing steps typically occur when a request is received by the host system from an application program to open a file for transmission across the network. This request may be in the form of a read, write or other type of command. Typically, the application program making the request is located on a client system on the network and will be needing the contents of the file for use by the application program.

In step 900, the request is received from an application program to open a file on the host system for use across the network. The file may be a type of file that needs a reservation to preserve quality of service or the application program may request that a reservation be made for the file. In the preferred embodiment, the high performance file system (HPFS) identifies a file needing reservation by matching the extension of the file against a list of file extensions provided by the resource reservation system (RRS). In step 910 the HPFS determines whether the file has any extended attributes. If not, then processing continues to step 915. If extended attributes for the file do exist, then in step 930 the HPFS reads extended attributes into memory. In step 940 the HPFS determines whether quality of service (QOS) parameters are found in the extended attributes. If not, then processing returns to step 915. In step 915, the RRS determines whether any default parameters exist for the requested file. If so, then the quality of service parameters are read from the default table. If default parameters do not exist, then there are no quality of service parameters for the file and a normal file open is performed. In an alternative embodiment, the host system may then determine quality of service parameters of the file at this time, possibly at the request of the client system. In this alternative embodiment, processing would then continue to step 950 below.

If quality of service parameters are found or determined in either extended attributes of the file or in the default table, then processing continues to making a reservation for the file by utilizing the resource reservation system. In step 950 a reservation is made on disk to meet the quality of service needs for the file. For example, a video stream may require 150 kilobytes per second while a disk may have 1.8 megabytes per second bandwidth. In this step the reservation to the disk for 150 kilobytes per second is made. In step 955, if the disk reservation is not successful then the open is failed and processing continues to step 925. In step 925, an error signal is returned to the application program originating the file request. The application program may then request the file be opened without a reservation. In an alternative embodiment, the command received from the remote system may include an instruction to open the file even if quality of service is not reserved. In this alternative embodiment, processing would continue to step 920 for opening the file. If the disk reservation is successful, then in step 960 a bus reservation is made to meet quality of service needs for the file. For example, one would reserve 150 kilobytes per second for a video stream for the bus. In step 965, if the bus reservation is unsuccessful, then processing

**EXHIBIT A**

5,581,703

| 11 | 12 |

returns to step **925** for generating an error signal to the application program. If a bus reservation is successful, then in step **970** main memory is reserved to meet quality of service needs for the file. For example, one may need to reserve 64 kilobytes per second of memory for the read buffer to satisfy a video system read. In step **975** it is determined whether the memory reservation is a success. If not, then processing returns to **925**. Otherwise, processing continues to step **980** where a network reservation is made to meet quality of service needs for the file. For example, a video stream may need 1.2 megabyte per second reservation on the network. In step **985**, if the network reservation is not a success, then processing returns to step **925** to generate an error signal to the application program. Otherwise, in step **990**, the file is opened and a success signal is returned to the requesting application program indicating that the file is available with reserved quality of service.

One main advantage of the present invention is that a file may not be opened for transmission until a reservation is made. Opening a file for transmission is an operation requiring a large amount of overhead for the host system. That is, in typical data processing systems, a file directory in the host needs to be read and control structures enabling access to the file need to be set up. This overhead is particularly cumbersome when the host system is already heavily loaded or overloaded with many demands on its system resources. As a result, the present invention helps relieve that burden by not requiring a file opening when resources are not available.

Although the present invention has been fully described above with reference to specific embodiments, other alternative embodiments will be apparent to those of ordinary skill in the art. Therefore, the above description should not be taken as limiting the scope of the present invention which is defined by the appended claims.

What is claimed is:

**1**. A method for providing multimedia files to a remote node in real-time comprising the steps of:

reading, from a file requested by a remote node, a stored indication of the bandwidth required for transmitting said file across a communications link, said bandwidth for preventing jitters or glitches in a presentation of said file;

determining whether said bandwidth is available for transmitting said file across said communications link;

reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

opening the requested file for transmission only if said bandwidth is reserved.

**2**. The method of claim **1** further comprising a step of notifying the remote node that bandwidth is determined not to be available for transmitting the requested file.

**3**. The method of claim **2** wherein the step determining said bandwidth required for transmitting said file includes determining said bandwidth when the file is initially stored.

**4**. An apparatus for providing multimedia files to a remote node in real-time comprising:

means for reading, from a file requested by a remote node, a stored indication of the bandwidth required for transmitting said file across a communications link, said bandwidth for preventing jitters or glitches in a presentation of said file;

means for determining whether said bandwidth is available for transmitting said file across said communications link;

means for reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

means for opening the requested file for transmission only if said bandwidth is reserved.

**5**. The apparatus of claim **4** further comprising means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

**6**. The apparatus of claim **5** wherein said means for determining said required bandwidth includes means for determining said required bandwidth when the file is initially stored.

**7**. A computer program product stored on a computer readable medium for providing multimedia files to a remote node in real-time comprising: computer readable program code means for reading, from a file requested by a remote node, a stored indication by the bandwidth required for transmitting said file across a communications link, said bandwidth for preventing jitters or glitches in a presentation of said file;

computer readable program code means for determining whether said bandwidth is available for transmitting said file across said communications link;

computer readable program code means for reserving said bandwidth if said bandwidth is determined to be available; and

computer readable program code means for opening the requested file for transmission only if said bandwidth is reserved.

**8**. The computer program product of claim **7** further comprising computer readable program code means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

**9**. The computer program product of claim **8** wherein said computer readable program code means for determining said required bandwidth includes means for determining said required bandwidth when the file is initially stored.

**10**. A data processing system for providing multimedia files to a remote node in real-time comprising:

storage means for storing files to be processed and transmitted;

processing means for processing said stored files;

means for reading, from a file stored in memory and requested by a remote node, a stored indication of the bandwidth required for transmitting said file across a communications links, said bandwidth for preventing jitters or glitches in a presentation of said file;

means for determining whether said bandwidth is available for transmitting said file across said communications link;

means for reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

means for opening the requested file for transmission only if said bandwidth is reserved.

**11**. The data processing system of claim **10** further comprising means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

**12**. The data processing system of claim **11** wherein said means for determining said required bandwidth includes means for determining said required bandwidth when the file is initially received for storage on said memory means.

* * * * *

EXHIBIT A

# EXHIBIT B

US005701465A

# United States Patent [19]

## Baugher et al.

[11] Patent Number: 5,701,465

[45] Date of Patent: Dec. 23, 1997

[54] **METHOD AND APPARATUS FOR RESERVING SYSTEM RESOURCES TO ASSURE QUALITY OF SERVICE**

[75] Inventors: **Mark John Baugher; Philip Yen-Tang Chang**, both of Austin; **Gregory Lynn Morris**, Round Rock; **Alan Palmer Stephens**, Austin, all of Tex.

[73] Assignee: **International Business Machines Corporation**, Armonk, N.Y.

[21] Appl. No.: **674,074**

[22] Filed: **Jul. 1, 1996**

### Related U.S. Application Data

[63] Continuation of Ser. No. 84,053, Jun. 29, 1993, Pat. No. 5,581,703.

[51] Int. Cl.[6] .............................. G06F 17/30; G06F 13/14
[52] U.S. Cl. ......................... 395/610; 395/621; 395/616; 395/200.06; 370/231; 370/468
[58] Field of Search .............................. 395/600, 200.06, 395/610, 616, 621; 370/84, 85.5, 231, 468

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,331,834 | 5/1982 | Ganz et al. . |
| 4,466,058 | 8/1984 | Girard et al. . |
| 4,538,147 | 8/1985 | Grow .................... 340/825.05 |
| 4,539,679 | 9/1985 | Bux et al. . |
| 4,654,867 | 3/1987 | Labedz et al. . |
| 4,870,641 | 9/1989 | Pattavina . |
| 4,991,079 | 2/1991 | Dann . |
| 5,054,109 | 10/1991 | Blackburn . |
| 5,136,581 | 8/1992 | Muehrcke . |
| 5,187,787 | 2/1993 | Skeen et al. . |
| 5,231,631 | 7/1993 | Buhrke et al. . |
| 5,265,262 | 11/1993 | Grube et al. . |
| 5,276,682 | 1/1994 | Van As et al. ......... 370/85.5 |
| 5,479,404 | 12/1995 | Francois et al. ......... 370/84 |
| 5,566,331 | 10/1996 | Irwin, Jr. et al. ......... 395/600 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 413 488 A2 | 8/1989 | European Pat. Off. . |
| 0 535 860 A2 | 4/1991 | European Pat. Off. . |

### OTHER PUBLICATIONS

"Anticipating the ISO File Transfer Standards in an Open Systems Implementation", N. K. Petersen et al, Computer Networks and ISDN Systems, vol. 9, No. 4, Apr. 1985, pp. 267–280.

*IBM Technical Disclosure Bulletin*, vol. 34, No. 7A, Dec. 1991, pp. 261–265, "Method of Bandwidth Management by Dynamic Port Configuration".

*IBM Technical Disclosure Bulletin*, vol. 35, No. 4B, Sep. 1992, pp. 112–113, "Control Program for Multimedia Workstations".

*IBM Technical Disclosure Bulletin*, vol. 35, No. 6, Nov. 1992, pp. 278–279, "Automated Accounting Stroage Transaction Unit Methodology".

*IBM Technical Disclosure Bulletin*, vol. 33, No. 12, May 1991, pp. 113–120, "Technique for Replicating Distributed Directory Information".

*IBM Technical Disclosure Bulletin*, vol. 34, No. 4B, Sep. 1991, pp. 416–417, "Inter-Client Resource Usage in Distributed Client-Server Presentation System".

(List continued on next page.)

*Primary Examiner*—Thomas G. Black
*Assistant Examiner*—C. Lewis
*Attorney, Agent, or Firm*—Volel Emile

[57] **ABSTRACT**

A method for providing files to a remote node including the steps of determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, reserving bandwidth for the requested file if bandwidth is determined to be available, and opening the requested file for transmission only if bandwidth is reserved. In addition, an apparatus for providing files to a remote node including apparatus for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, apparatus for reserving bandwidth for the requested file if bandwidth is determined to be available, and apparatus for opening the requested file for transmission only if bandwidth is reserved.

**16 Claims, 9 Drawing Sheets**



EXHIBIT B

**5,701,465**

Page 2

OTHER PUBLICATIONS

*IBM Technical Disclosure Bulletin*, vol. 35, No. 6, Nov. 1992, pp. 409–411, "Method and Apparatus for the Statistical Multiplexing of Voice, Data, and Image Signals".

*IBM Technical Disclosure Bulletin*, vol. 36, No. 3, Mar. 1993, pp. 133–139, "Efficient, Real–Time Address Resolution in Backbone Networks of General Topology".

*IEEE Journal on Selected Areas in Communication*, vol. 7, No. 5, Jun. 1989, "Packet Communication Protocol for Image Services on a High–Speed Multimedia LAN", pp. 782–788.

*Advanced Technology Group Apple Computer, Inc.*, 1991, "Desktop Multimedia Communications—Breaking the Chains", D. Blackketter et al., pp. 73–77.

*Lancaster University, UK.*, "Resource Management in Multimedia Communication Stacks", A. Campbell et al., pp. 287–295.

*IEEE Journal on Selected Areas in Communication*, vol. 8, No. 3, Apr. 1990, "A Scheme for Real–Time Channel Establishment in Wide–Area Networks," D. Ferrari et al., pp. 368–379.

*IEEE Communications Magazine*, Nov. 1990, "Client Requirements for Real–Time Communication Services", D. Ferrari, pp. 65–72.

*Journal of Association for Computing Machinery*, vol. 20, No. 1, Jan. 1973, "Scheduling Algorithms for Multiprogramming in a Hard–Real–Time Environment", J. W. Layland et al., pp. 46–61.

*Globecom '89. IEEE Global Telecommunications Conference and Exhibition Communications Technology for the 1990s and Beyond*, "A Network Environment for Studying Multimedia Network Architecture and Control", R. Lake et al., pp. 1232–1236.

*1992 IEEE International Conference on Selected Topics in Wireless Communications. Conference Proceedings*, "Communications Requirements of Multimedia Applications: A Preliminary Study", T. Kwok, pp. 138–142.

*Technical Reference. Appendix E.*, "AVSS File Format", pp. E1–E33, no date.

*CIP Working Group*, Oct. 1990, "Experimental Internet Stream Protocol", Version 2 (ST–II), C. Topolcic—Editor, pp. 1–148.

*International Telegraph and Telephone Consulative Committe (CCITT)*, Period 1989–1992, "COM XI–R 133–E", Working Party XI/6, pp. 1–88.

*RZ 1463 Log #53321) Apr. 25, 1986 Communications 24 pages: Research Report*, "Data/Voice Integration Based on the IEEE 802–5 Token–Ring LAN", F. Cross et al., pp. 1–24.

*Multimedia File Formats/Waveform Audio File Format (WAVE)*, Chapter 8, pp. 40–45.

# EXHIBIT B

-32-



FIG. 1

EXHIBIT B

-33-

**U.S. Patent**          Dec. 23, 1997          Sheet 2 of 9          **5,701,465**



**FIG. 2**

**EXHIBIT B**

-34-



FIG. 3

EXHIBIT B

-35-

U.S. Patent          Dec. 23, 1997          Sheet 4 of 9          5,701,465



FIG. 4

EXHIBIT B

-36-

U.S. Patent        Dec. 23, 1997        Sheet 5 of 9        5,701,465



**FIG. 5**



**FIG. 6**

EXHIBIT B

-37-

U.S. Patent          Dec. 23, 1997          Sheet 6 of 9          5,701,465



FIG. 7A

FIG. 7B

EXHIBIT B

-38-



FIG. 7C



FIG. 8

# EXHIBIT B

-39-



**FIG. 9A**

EXHIBIT B

-40-



FIG. 9B

EXHIBIT B

- 41 -

5,701,465

1

## METHOD AND APPARATUS FOR RESERVING SYSTEM RESOURCES TO ASSURE QUALITY OF SERVICE

This application is a continuation of application Ser. No. 08,084,053, filed on Jun. 29, 1993 and now U.S. Pat. No. 5,581,703.

### RELATED PATENT APPLICATIONS

Related patent applications include commonly assigned copending patent application U.S. Ser. No. 08/085,264 filed on filed on the same date as the present application, entitled "SYSTEM AND METHOD FOR PROVIDING MULTI-MEDIA QUALITY OF SERVICE SESSIONS IN A COM-MUNICATIONS NETWORK", hereby incorporated by reference; commonly assigned copending patent application U.S. Ser. No. 08/085,274 filed on the same date as the present application, entitled "SYSTEM AND METHOD FOR BANDWIDTH RESERVATION FOR MULTIMEDIA TRAFFIC IN COMMUNICATIONS NETWORKS" now U.S. Pat. No. 5,388,097, hereby incorporated by reference; and commonly assigned copending patent application U.S. Ser. No. 08/085,275 filed on the same date as the present application, entitled "MULTIMEDIA RESOURCE RESER-VATION SYSTEM", hereby incorporated by reference.

### TECHNICAL FIELD

The present invention relates to data processing systems and more particularly to data processing systems providing resource reservation to assure a desired quality of service.

### BACKGROUND ART

It has long been known to provide computer workstations interconnected by digital communication networks whereby users of the individual workstations may communicate with one another over the network for tasks such as file serving from a host or server to client computers. This has been previously common, for example, by means of a typed note, data or program file transmitted to another user. More recently, users have increasingly requested multimedia file services, desktop conferencing, remote presentations, and other multimedia applications between network users. However, such multimedia applications utilizing data-intensive sound, voice, and video flows require performance guarantees for high disk access and high bandwidth com-munication links between distributed computing systems with minimal communication delay, maximum throughput, and instantaneous burst communication capability. As a result, it has become very difficult to schedule appropriate resources to meet the requirements of such multimedia applications.

Prior art has recognized that certain data in a network, such as that associated with multimedia, may require prior-ity handling. Thus, for example, a "quality of service " (QOS) or bandwidth has been defined in the literature. Quality of service or bandwidth seeks to describe various parameters which may be specified in an attempt to define certain minimum requirements which must be met for transmission of given data types over the network. See, for example, quality of service standards set forth in the OSI TP4 Open System Interconnect Standard X.214 and the quality of service standards defined in CCITTQ.931 (ISDN), Q.933 (frame relay), and Q.93B (B-ISDN ATM) drafts. As yet another example there is an architected priority mecha-nism in the IEEE 802.5 Token Ring. A station on the ring with a high priority frame to send may indicate this in an

2

access control field of a passing frame. When a station sending the frame releases the token, it releases the token at the priority of the AC field, and eventually sets it back to its original priority as specified in an IEEE 802.5 medium access control protocol. The IEEE standard and implemen-tations thereof merely specify a protocol for increasing and decreasing priority. However, the user of such a service, such as a client-server file system, has to determine when service guarantees are needed for certain file accesses. For example, multimedia file reads for playing sound, voice, and video from a server to a client need certain quality of service guarantees.

Allocating resources when a connection is made between digital computers, such as for a client-server session, is known where memory is allocated to hold information related to the session. Buffers are also commonly reserved for file access on computers, such as on a server computer. Buffers may also be reserved on the client computer for multimedia file where a memory buffer must be large enough to store a reserve of file elements so that variations in delay between the server and client are absorbed. That is, there should be enough file elements stored in the memory buffer so that the buffer will not go empty during the playback of sound, voice or video. Otherwise, a glitch or jitter will occur causing a deterioration in the quality of a presentation. For example, if the maximum delay is two seconds and the multimedia flow averages 150 kilobytes per second, then a buffer at least 300 kilobytes in size is needed to preserve quality of service.

Many types of files contain information in their header useful for determining such quality of service parameters. Other types of files may require that the file be read, parsed or scanned to determine such quality of service parameters. However, in a general purpose client-server environment, a very large variety of file types and formats exist and a file server may not be programmed to determine quality of service parameters in all cases. In addition, an application program, running on a workstation in a client-server environment, may not recognize whether a file being accessed is located on the workstation or on a remote file server. If the file is located on the application program workstation, then quality of service is generally met. However, if the file being accessed is located on a remote server, then the file access must contend for server resources such as disk cycles or bandwidth, disk controller cycles, system bus resources, server processor resources, and net-work resources. As a result, it is difficult to maintain quality of service in a client-server environment for remote file accesses.

### DISCLOSURE OF THE INVENTION

A method for providing files to a remote node including the steps of determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, reserving bandwidth for the requested file if bandwidth is determined to be available, and opening the requested file for transmission only if bandwidth is reserved. In addition, an apparatus for providing files to a remote node including apparatus for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node, apparatus for reserving bandwidth for the requested file if bandwidth is determined to be available, and apparatus for opening the requested file for transmission only if bandwidth is reserved.

A further understanding of the nature and advantages of the present invention may be realized by reference to the remaining portions of the specification and the drawings.

EXHIBIT B

-42-

5,701,465

3

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a block diagram of a typical data processing system utilized by a preferred embodiment of the invention;

FIG. 2 is an illustration of a data processing system including three workstations interconnected by a network in accordance with the subject invention;

FIG. 3 is a block diagram illustrating a multilayered computer communication network model based upon the OSI layered reference model;

FIG. 4 is a block diagram of a preferred layered open systems interconnection model showing the relationship of components of the subject invention to the layers;

FIG. 5 is a flowchart illustrating initializing a host system with default quality of service parameters for types of files;

FIG. 6 illustrates a default table generated by the process described in FIG. 5;

FIGS. 7A–7C are a flowchart illustrating a preferred method for individually determining quality of service parameters for files;

FIG. 8 is a block diagram of a reservation table utilized by the resource reservation system to handle resource reservations according to a preferred embodiment of the invention; and

FIGS. 9A–9B are a flowchart illustrating a preferred method for reserving a desired quality of service of various resources.

### BEST MODE FOR CARRYING OUT THE INVENTION

FIG. 1 is a block diagram of a typical data processing system **100** utilized by a preferred embodiment of the invention. The data processing system includes main processor(s) **110** coupled to a main memory **120** in computer box **105** with input device(s) **130** and output device(s) **140** attached. Main processor(s) **110** may include a single processor or multiple processors. Input device(s) **130** may include a keyboard, mouse, tablet or other types of input devices. Output device(s) **140** may include a text monitor, plotter or other types of output devices.

The main processor may also be coupled to graphics output device(s) **210** such as a graphics display through a graphics adapter **200**. Graphics adapter **200** may be located in an adapter slot **160A**. Graphics adapter **200** receives instructions regarding graphics from main processor **110** on bus **150**, thereby rendering the desired graphics output from the main processor.

A communications adapter **250** such as a modem or a network adapter for networks such as token ring or ethernet may be located in slot **160C**. The slot provides communications with main processor **110** across bus **150**. Communications adapter **250** may communicate with other data processing systems **270** across communications line **260**. As a result, the main processor may communicate with other data processing systems **270** via bus **150**, slot **160C**, communications adapter **250** and communications line **260**.

A hard disk **255** may be located in slot **160D** to provide additional memory for use by the main processor. Computer readable removable media **290**, such as a magnetic diskette or a compact disc, may be inserted into an input/output device **285**, such as a disk drive or a CD-ROM (compact disc—read only memory) drive. Data is read from or written to the removable media by the I/O device under the control of the I/O device controller **280**. The I/O device controller communicates with the main processor through slot **160E**

4

across bus **150**. Main memory **120**, hard disk **255** and removable media **290** are all referred to as memory for storing data for processing by processor **110**. One of the preferred implementations of the present invention is as several sets of instructions in a code module resident in the main memory **120**. Until required by the computer system, the sets of instructions may be stored in another computer memory, for example, in a hard disk drive, or in a removable memory such as an optical disk or floppy disk for eventual use in a CDROM or the floppy disk drive.

FIG. 2 illustrates a data processing system comprising a number of workstations (here, three workstations **300, 320,** and **330**) interconnected by a pair of data networks **310** and **340** (also referred to as communications links), so as to permit communication between the workstations (also referred to as nodes). It is assumed that the data processing shown in FIG. 2 is of a type which permits concurrent real-time communication between the users. The network operates according to a conventional network protocol, such as the token ring protocol described in *Token Ring NetWork Architecture* reference, SC30-3374, IBM, 1989.

FIG. 2 depicts only one possible hardware configuration for a data processing network. Other configurations are possible. For example, the data processing system could be based upon a star network, or a host processor connected to a plurality of dumb terminals, or could further be based upon a plurality of remote processors connected by a communication network. the networks could also be based upon the telephone network, and ISDN network, or any other "dial up" networks. Moreover, the workstations could be located within the single workspace or within a local area, or could be remote from one another. A source for detailing technical planning information for configuring a network of workstations in accordance with the invention, is the *IBM Extended Services for OS/2 Example Scenarios Manual*, 1991.

Multimedia computing is the processing of various media, such as video, waveform audio, musical instrument digital interface (MIDI) streams, animation, graphics, and text. Media processing includes the capture, authoring (editing) and playback of media streams as well as other data processing applications. Multimedia documents which are stored on some non-volatile medium, such as a disk, are referred to as recorded multimedia applications. There are also live multimedia applications in which two or more people communicate with each other at the same time using a computer. Live multimedia applications are normally conducted across space and time indicating that live multimedia is inherently distributed. Even recorded multimedia applications require distributed file system services to share large volumes of stored media, such as video disk, audio information, or computer-generated images. Thus, it is critical that a prioritizing scheme in accordance with the invention for multimedia applications includes support for a distributed environment.

To reduce design complexity, most networks are organized as a series of layers, each one built upon its predecessor as described in *Computer Networks*, Tannenbaum, Andrew S., Prentice Hall (1988) and *OSI, A Model for Computer Communications Standards*, Black, Ulyess, Prentice Hall, 1991. The number of layers, the name of each layer, contents, and function of each layer differ from network to network. However, in each network, the purpose of the layers is to offer certain services to the higher layers, shielding those layers from the details of how the offered services are actually implemented. The purpose, function, and details of each of the layers and their interaction is set forth in the previously noted references and is familiar to communication programmers ordinarily skilled in the art.

EXHIBIT B

-43-

5,701,465

| 5 | 6 |

Priority assurance is an important factor in ensuring bandwidth or quality of service, and is enabled by operation of a component which may be implemented in hardware logic or software. The component regulates access to the priority queue or transmit channel that is attached to the shared medium local area network section. Access to the priority queue or transmit channel will pass through this component, thus subjecting all communication transactions to rejection or tracking by the component. A more detailed discussion of this component and the related station's bandwidth manager component are described in commonly assigned copending patent application U.S. Ser. No. 07/930,587, filed Aug. 17, 1992, entitled "Network Priority Management" (IBM Docket No. AT9-92-089), hereby incorporated by reference.

FIG. 3 is a block diagram illustrating a multilayered computer communication network model based upon the OSI layered reference model. Further detail of this OSI and related IEEE models may be found in *OSI, A Model for Computer Communications Standards*, infra. A client system 20A is shown communicating with a server system 20B across a communications link 30. The seven layers of the OSI model for each system are shown as reference numerals 40–52. The lowest layer is physical layer 40A–40B which is responsible for implementing a physical circuit between data terminal equipment and data circuit terminating equipment.

A data link layer 42A–42B is responsible for transfer of data across the link. A network layer 44A–44B specifies the interface of the user into a network and also defines network switching/routing and communications between networks. A transport layer 46A–46B provides an interface between the data communications network and the upper three layers. This layer is of particular interest because it provides the user options in obtaining certain levels of quality, and is designed to keep the user isolated from some of the physical and functional aspects of the network. A session layer 48A–48B serves as a user interface into the transport layer below, providing a means for exchange of data between users such as simultaneous transmission, alternate transmission, checkpoint procedures and the like. The remaining two layers, a presentation layer 50A–50B and an application layer 52A–52B ensure that user applications can communicate with each other and further concern the support of the end-user application process. Please note that each of the client system layers is shown communicating with the corresponding server system layers. Although each of the layers perceives that these communications are direct, the communications are shown as dotted lines because the only direct communications are performed through the network.

It will be noted from FIG. 3 that there are other implementations in the art of such an OSI reference model bearing varying degrees of similarity thereto, a portion of one being depicted in the left part of FIG. 3 as the IEEE model, a physical layer 60 may be seen corresponding to the physical layer of the OSI model. The IEEE recognized a need to divide the data link layer into two sublayers in order to handle different link configurations and thus a medium access control (MAC) 62 and logical link control (LLC) 64 were provided for. The sublayer is protocol-specific (such as to a LAN such as Ethernet) whereas the LLC serves as an interface to an upper layer protocol, typically the network layer (and isolates the network layer from the specific actions of the MAC sublayer). One purpose of depicting varying forms of a multilayered computer communication network in FIG. 3 is to illustrate that the invention admits to implementations in any number of such multilayered

models, and is thereby not intended to be limited to application to the OSI reference model emphasized in the description herein.

FIG. 4 is a block diagram of a preferred layered open systems interconnection model showing the relationship of components of the subject invention to the layers and to the data processing system. An application program 70 on a client system seeks a file to be accessed through a file system application program interface (API) 72 to a redirector 74. If the file is not located on the client system, then the redirector determines which remote system, such as the server system, has the desired file. If the file is located on the client system, then the file is accessed on a local file system not shown. If the file is located on the server system, then the redirector passes a request for access to the desired file to the server system through a communications transport 76 (such as netbios or TCP/IP) to a network adapter device driver 78. The network device driver then sends the request to the server system through a network adapter 79 across a communications link 80 (such as ethernet or token ring) to the server system network adapter 99 and network adapter device driver 98. The network adapter device driver then passes the request on to the communications transport 96. The communications transport then passes the request on to a high performance file system (HPFS) 94. The high performance file system then passes the file request onto a resource reservation system (RRS) 92. The resource reservation system then determines whether there are any quality of service parameters for the requested file. If not, then the resource reservation system so notifies the high performance file system. The high performance file system then accesses the file on a local disk drive not shown. If the resource reservation system determines that there are quality of service parameters for the requested file, then the resource reservation system then automatically reserves the appropriate resources to ensure that the quality of service for the file is maintained. This process will be described in detail below. The resource reservation system so notifies the high performance file system. The high performance file system then opens and accesses the file through a local file system to a local disk drive. Access to the file is then provided to the requesting application program, with quality of service guarantees if established, and the application program is so notified. This notification occurs through communications transport 96, network device driver 98, network adapter 99, communications link 80, network adapter 79, network device driver 78, communications transport 76, redirector 74, and file system API 72. Please note that the elements of the client and server systems are shown corresponding to layers of the OSI model described above. In addition, the elements of the client and host systems correspond to the elements of the data processing system described above. Elements 70–78 reside in memory of the client system and are executed by the client system processor. Network adapters 79 and 99 are communications adapters for the client and hosts systems respectively. In addition, portions of the network adapter device drivers may reside on and be executed by the network adapters. Communications link 80 may be a network such as Ethernet or Token ring. Elements 92–98 reside in memory of the host system and are executed by the host system processor.

This system allows for easy access to the files across a network and also provides the capabilities for an automatic resource reservation system as will be described below.

Determining Quality of Service Parameters

There are many types of quality of service parameters known in the art. The parameters of particular interest to a

5,701,465

7

preferred embodiment of the invention are throughput, burst, and delay. Throughput is the average amount of information passed through the communications link in a given period of time such as 150 kilobytes per second. Burst is the maximum amount of information passed through the communications link in a short period of time. Delay is the maximum amount of delay that can be tolerated, typically due to buffer size in relation to throughput.

Default quality of service parameters may be provided for files for types of files. That is, files are typically stored as XXXXXX.YYY where .YYY is the extension of the file. The extension typically describes the type of the file (e.g. .VOC for a voice file and .WAV for a wave file). These default values may be provided.

FIG. 5 is a flowchart illustrating initializing a host system with default quality of service parameters for types of files. In step 350, the user provides to the high performance file system (HPFS) a quality of service (QOS) file listing file types and quality of service parameters for each file type. The user may provide this QOS file in a variety of ways. A soft copy of a QOS file may be provided with a set of multimedia files by a vendor and provided therewith for installation by the user or the vendor may provide a software tool for the user to use to create the QOS file. In addition, the user may respond to a set of queries from the host system. In step 360, the first entry in the QOS file is read. In step 370, if end of file is not reached, then processing continues to step 380. In step 380, a description of the file type and its quality of service parameters are extracted from the record and added to a default table in memory. FIG. 6 illustrates a default table 392 generated by the process described in FIG. 5. The default table may include values for file type 393, throughput 394, burst 395, and delay 396. Processing then returns to step 360 to read the next record in the QOS file. If end of file is reached in step 370, then the default table containing the file types and quality of service parameters are provided to the resource reservation system (RRS) for later use as will be described below.

FIGS. 7A–7C are a flowchart illustrating a preferred method for individually determining quality of service parameters for files. There are many types of files which may require quality of service and it is preferable to obtain the quality of service parameters for an individual file when that file is transferred to the host computer for storage on the host computer. This individual determination of quality of service parameters for files may be performed automatically for certain types of files such as voice (VOC), wave (WAV), audio-visual (AVI), or other types of multimedia files. These quality of service parameters may also be obtained by querying the operator as the files are transferred and stored in the host computer. In an alternative embodiment, the quality of service parameters may be determined when a file is first used or at each use of a file. In another alternative embodiment, the quality of service parameters may be determined for an application by accumulating the quality of service parameters of each file to be accessed by the application.

In step 400, the file is transferred to the host computer for storage. The host computer may receive the file from an external media such as a CD-ROM or floppy disk, or from another data processing system across a communications adapter. In step 405, it is determined whether quality of service parameters are to be calculated for the transferred file. The user may request calculation of quality of service parameters by using a particular command to transfer the file to the host system. In addition, the host system may automatically calculate quality of service parameters for certain

8

types of files. If no parameters are to be calculated, then processing ends. Otherwise, in step 410, a quality of service calculation utility may be executed to determine the quality of service parameters for the file. This utility may be executed at the request of the user storing the file on the host system or the utility may be automatically executed for certain types of predesignated files. In step 420 the extension of the file is obtained. That is, files are typically stored as XXXXXX.YYY where .YYY is the extension of the file. The extension typically describes the type of the file (e.g. .VOC for a voice file and .WAV for a wave file). Multimedia files are preferably distinguished into two types, fixed sample or variable sample. Fixed sample files have fixed length sample records and may include a header record describing the records. An example of a fixed sample file is a voice (VOC) file which typically has a header followed by a number of contiguous bytes, each byte being an eight sample. The header provides information about the sampling rate (e.g. 8000, 11000 or 44000 samples per second) and the number of channels (e.g. one for mono, two for stereo, more than two for multichannel). Variable sample files have variable length sample records and require greater processing to determine quality of service parameters according to the preferred embodiment of the invention. An example of a variable sample file is a digital video interactive (DVI) file which has a series of reference frames with two or more delta frames interspersed between each pair of reference frames. The size of the delta frames depends on the amount of movement occurring between reference frames. In step 430, based on the extension, if the file is a fixed sample file then processing continues to the flowchart of FIG. 7B. If the file is a variable sample file, then processing continues to the flowchart of FIG. 7C.

Once the quality of service parameters are obtained, then in step 440, the quality of service parameters are preferably stored as extended attributes of the file. That is, many operating systems such as OS/2 (trademark of International Business Machines Corp.) have the capability of storing and retrieving extended attributes for any file without requiring the file be opened. Extended attributes are described in detail in the *OS/2 2.0 Technical Library, Programming Guide*, Volume 1, Version 2.00, hereby incorporated by reference. As a result, the extended attributes may be accessed to determine whether appropriate resources are available for utilizing the file prior to opening the file. In alternative embodiments, the quality of service parameters may be stored in the file or may be stored in a table with reference to the file. If the quality of service parameters are determined each time the file is used, then the parameters do not need to be stored.

FIG. 7B is a flowchart illustrating a preferred method for determining quality of service parameters for fixed sample files (that is, files that have fixed length records for each sample and typically have a header record describing the records). In step 500, the file header is read. If a file header is not available, then the first record in the file is read. In step 510, information for determining quality of service is extracted from the file header or the first record. For fixed sample records, the number of concurrent channels or data streams, the frequency of sampling data, and the sample size are extracted from the file.

In step 520, the quality of service parameters are calculated from the information obtained from the file. These parameters are determined for reading the files. However, the parameters could also be determined for writing to the files. The quality of service parameters typically determined are read throughput and read burst. Throughput is the

EXHIBIT B

-45-

5,701,465

9

average number of bits or bytes needed to transmit per second in order to provide realtime use of the data. Factors includes the number of channels (mono, stereo or multichannel), the sampling frequency, and the sample size. For example, the throughput would be equal to the number of data streams times the sample frequency times the sample size. That is, a stereo signal with a sample rate of 44 kilohertz with a sample size of 16 bits per sample may be utilized for compact disk quality music file for a throughput of 176 kilobytes per second. In addition, other QOS parameters such as burst, minimum data throughput, maximum data throughput, or other measures may be calculated. Burst is the amount of data typically transmitted in a short time interval. Other possible parameters could be determined including various measures of dispersion for variable sample files. For example, a throughput average and a throughput standard deviation could be determined. These parameters are determined by determining the amount of data to be transmitted. Processing then returns to FIG. 7A where the parameters are then stored as extended attributes of the file.

FIG. 7C is a flowchart illustrating a preferred method for determining quality of service parameters for variable sample files (that is, files that have fixed length records for each sample and typically have a header record describing the records).

In step 600, the file header and file trailer are read if available. In step 610, the number of frames in the file of video is determined from information in the header or trailer. In step 620, the frame rate is also determined based on information in the header or trailer of the file. For example, NTSC (National Television Standard Committee) signals are 29.97 frames per second and PAL television signals are 25 frames per second. In step 630 the first frame of the file is read. In step 640 the number of bytes in the frame is calculated and stored. In step 650 it is determined whether this is the last frame in the file. If no, then processing returns to step 630 to read the next frame and extract information from that frame. If yes, then in step 660, the various quality of service parameters are calculated including throughput and burst. Processing then returns to FIG. 7A where in step 450, the quality of service parameters are then stored as extended attribute of the file.

### Determining Network Capacity

Before reservation of resource capacity is performed, it is preferable that the amount of that capacity be determined for the various types of networks and other resources that may be reserved. Resource capacity may easily be obtained by querying the operator of the system. However, the operator may not know the capacity or the capacity may vary since the operator was queried. For example, a network may be slowed by more clients being added to the network, thereby increasing network overhead. Resource capacity may also be determined by determining what resources are available. For example, the host system may detect what resources are on the system during initial program load (sometimes referred to as sniffing). The host system may then compare the resources detected to a table listing capacities for all types of resources to determine what the resource capacity is. Resource capacity may also be determined by running some benchmarking tools to detect what the actual capacity of the resources are. For example, a series of reads and writes to a disk drive to determine its capacities.

### Reserving Quality of Service

FIG. 8 is a block diagram of a reservation table 800 utilized by the resource reservation system to handle

10

resource reservations according to a preferred embodiment of the invention. The reservation table includes a listing of each resource 810, its location 820, and its capacities 830 that are available for reservation. The reservation table also includes a variable number of reservations 840 for each resource. For example, an ethernet adapter located in adapter slot #1 has a capacity of 2 megabytes per second and has two reservations of that capacity.

FIGS. 9A–9B are a flowchart illustrating a preferred method for reserving a desired quality of service of various resources. This reservation process is preferably performed for desired files, typically multimedia or other types of files requiring uninterrupted service, as those files are opened. However, the below described process may also be utilized for providing quality of service for desired sessions or applications. The below processing steps typically occur when a request is received by the host system from an application program to open a file for transmission across the network. This request may be in the form of a read, write or other type of command. Typically, the application program making the request is located on a client system on the network and will be needing the contents of the file for use by the application program.

In step 900, the request is received from an application program to open a file on the host system for use across the network. The file may be a type of file that needs a reservation to preserve quality of service or the application program may request that a reservation be made for the file. In the preferred embodiment, the high performance file system (HPFS) identifies a file needing reservation by matching the extension of the file against a list of file extensions provided by the resource reservation system (RRS). In step 910 the HPFS determines whether the file has any extended attributes. If not, then processing continues to step 915. If extended attributes for the file do exist, then in step 930 the HPFS reads extended attributes into memory. In step 940 the HPFS determines whether quality of service (QOS) parameters are found in the extended attributes. If not, then processing returns to step 915. In step 915, the RRS determines whether any default parameters exist for the requested file. If so, then the quality of service parameters are read from the default table. If default parameters do not exist, then there are no quality of service parameters for the file and a normal file open is performed. In an alternative embodiment, the host system may then determine quality of service parameters of the file at this time, possibly at the request of the client system. In this alternative embodiment, processing would then continue to step 950 below.

If quality of service parameters are found or determined in either extended attributes of the file or in the default table, then processing continues to making a reservation for the file by utilizing the resource reservation system. In step 950 a reservation is made on disk to meet the quality of service needs for the file. For example, a video stream may require 150 kilobytes per second while a disk may have 1.8 megabytes per second bandwidth. In this step the reservation to the disk for 150 kilobytes per second is made. In step 955, if the disk reservation is not successful then the open is failed and processing continues to step 925. In step 925, an error signal is returned to the application program originating the file request. The application program may then request the file be opened without a reservation. In an alternative embodiment, the command received from the remote system may include an instruction to open the file even if quality of service is not reserved. In this alternative embodiment, processing would continue to step 920 for opening the file. If the disk reservation is successful, then in

5,701,465

| 11 | 12 |

step 960 a bus reservation is made to meet quality of service needs for the file. For example, one would reserve 150 kilobytes per second for a video stream for the bus. In step 965, if the bus reservation is unsuccessful, then processing returns to step 925 for generating an error signal to the application program. If a bus reservation is successful, then in step 970 main memory is reserved to meet quality of service needs for the file. For example, one may need to reserve 64 kilobytes per second of memory for the read buffer to satisfy a video system read. In step 975 it is determined whether the memory reservation is a success. If not, then processing returns to step 925. Otherwise, processing continues to step 980 where a network reservation is made to meet quality of service needs for the file. For example, a video stream may need 1.2 megabyte per second reservation on the network. In step 985, if the network reservation is not a success, then processing returns to step 925 to generate an error signal to the application program. Otherwise, in step 990, the file is opened and a success signal is returned to the requesting application program indicating that the file is available with reserved quality of service.

One main advantage of the present invention is that a file may not be opened for transmission until a reservation is made. Opening a file for transmission is an operation requiring a large amount of overhead for the host system. That is, in typical data processing systems, a file directory in the host needs to be read and control structures enabling access to the file need to be set up. This overhead is particularly cumbersome when the host system is already heavily loaded or overloaded with many demands on its system resources. As a result, the present invention helps relieve that burden by not requiring a file opening when resources are not available.

Although the present invention has been fully described above with reference to specific embodiments, other alternative embodiments will be apparent to those of ordinary skill in the art. Therefore, the above description should not be taken as limiting the scope of the present invention which is defined by the appended claims.

What is claimed is:

1. A method for providing files to a remote node comprising the steps of:

   determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node;

   reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

   opening the requested file for transmission only if said bandwidth is reserved.

2. The method of claim 1 further comprising a step of notifying the remote node that said bandwidth is determined not to be available for transmitting the requested file.

3. The method of claim 1 further comprising a step of determining bandwidth requirements for transmitting the file.

4. The method of claim 3 wherein the step of determining includes determining said bandwidth requirements for the file when the file is initially stored.

5. An apparatus for providing files to a remote node comprising:

   means for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node;

   means for reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

   means for opening the requested file for transmission only if said bandwidth is reserved.

6. The apparatus of claim 5 further comprising means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

7. The apparatus of claim 5 further comprising means for determining bandwidth requirements for transmitting the file.

8. The apparatus of claim 7 wherein said means for determining includes means for determining bandwidth requirements for the file when the file is initially stored.

9. A computer program product stored on a computer readable medium for providing files to a remote node comprising:

   computer readable program code means for determining whether bandwidth is available for transmitting across a communications link a file requested by a remote node;

   computer readable program code means for reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

   computer readable program code means for opening the requested file for transmission only if said bandwidth is reserved.

10. The computer program product of claim 9 further comprising computer readable program code means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

11. The computer program product of claim 9 further comprising computer readable program code means for determining bandwidth requirements for transmitting the file.

12. The computer program product of claim 11 wherein said computer readable program code means for determining includes means for determining bandwidth requirements for the file when the file is initially stored.

13. A data processing system for providing files to a remote node comprising:

   storage means for storing files to be processed and transmitted;

   processing means for processing said stored files;

   means for determining whether bandwidth is available for transmitting across a communications link a file stored in memory and requested by a remote node;

   means for reserving said bandwidth for the requested file if said bandwidth is determined to be available; and

   means for opening the requested file for transmission only if said bandwidth is reserved.

14. The data processing system of claim 13 further comprising means for notifying the remote node that said bandwidth is determined not to be available for transmitting the file.

15. The data processing system of claim 13 further comprising means for determining bandwidth requirements for transmitting the file.

16. The data processing system of claim 15 wherein said means for determining includes means for determining bandwidth requirements for the file when the file is initially received for storage on said memory means.

* * * * *

EXHIBIT B

-47-

# EXHIBIT C

US006807166B1

(12) **United States Patent**                    (10) **Patent No.:**     **US 6,807,166 B1**

Ohura                                            (45) **Date of Patent:**         **Oct. 19, 2004**

(54) **GATEWAY FOR INTERNET TELEPHONE**

(75) Inventor: **Hitoshi Ohura**, Kawasaki (JP)

(73) Assignee: **Fujitsu Limited**, Kawasaki (JP)

(*) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/243,351**

(22) Filed:    **Feb. 1, 1999**

(30)        **Foreign Application Priority Data**

Aug. 5, 1998    (JP) .......................................... 10-222017

(51) Int. Cl.[7] .......................... H04L 12/66; H04L 12/28
(52) U.S. Cl. ..................... 370/352; 370/401; 379/88.17
(58) Field of Search ................................ 370/351–356, 370/401, 475, 395, 52; 379/88.17, 93.01, 93.07, 265.09

(56)            **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,848,143 | A | * 12/1998 | Andrews et al. | ............. 379/219 |
| 6,104,711 | A | *  8/2000 | Voit | ........................... 370/352 |
| 6,157,636 | A | * 12/2000 | Voit et al. | .................. 370/353 |
| 6,167,043 | A | * 12/2000 | Frantz | ...................... 370/356 |
| 6,205,139 | B1 | *  3/2001 | Voit | ........................... 370/389 |
| 6,233,234 | B1 | *  5/2001 | Curry et al. | ............... 370/356 |
| 6,243,374 | B1 | *  6/2001 | White et al. | ............... 370/352 |
| 6,347,085 | B2 | *  2/2002 | Kelly | ......................... 370/352 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 6-224901 | 8/1994 |
| JP | 9-168065 | 6/1997 |
| JP | 10-98495 | 4/1998 |
| WO | 97/47119 | 12/1997 |

* cited by examiner

Primary Examiner—Alpus H. Hsu
Assistant Examiner—Toan D. Nguyen
(74) Attorney, Agent, or Firm—Katten Muchin Zavis Rosenman

(57)            **ABSTRACT**

A gateway for an internet telephone system manages calls to and from personal computers and enables the personal computers to use the internet telephone system with an IP address assigned by a DHCP server or a private IP address. The gateway has a LAN receiver for processing an incoming call from the Internet or a personal computer, a line transmitter for processing an outgoing call to a telephone according to a request from the LAN receiver, a line receiver for processing an incoming call from a telephone, a LAN transmitter for processing an outgoing call to the Internet or a personal computer according to a request from the line receiver, and a logger for logging information about calls according to requests from the LAN transmitter and line transmitter. If the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies an IP address as a receiver address, the LAN receiver requests the LAN transmitter to make a call based on the incoming call, and the LAN transmitter requests the logger to log information about the call.

**18 Claims, 16 Drawing Sheets**





# F i g.1

## PRIOR ART



EXHIBIT C



Fig.2A
**PRIOR ART**

Fig.2B
**PRIOR ART**

EXHIBIT C

-50-

Fig.3



EXHIBIT C

-51-



Fig.4

EXHIBIT C

# F i g.5A

| TEL. NO. | IP ADDRESS OF PC | RECEPTION STATE |
|----------|------------------|-----------------|
| 1100 | 133.162.119.1 | ENABLED |
| 1200 | ———— | ———— |
| - - - - - | - - - - - | - - - - - |

# F i g.5B

| IP ADDRESS | TEL. NO. |
|------------|----------|
| 133.162.119.1 | 1100 |
| 133.162.119.2 | 1200 |
| - - - - - | - - - - - |

## EXHIBIT C

-53-



Fig.6

EXHIBIT C



Fig.7

EXHIBIT C



Fig. 8

EXHIBIT C



Fig.9

EXHIBIT C



Fig.10

EXHIBIT C

Fig.11



EXHIBIT C

-59-



Fig.12A

EXHIBIT C

-60-

Fig 12B

EXHIBIT C                                    -61-



Fig.13

EXHIBIT C                                    -62-



Fig.14

EXHIBIT C                                                    -63-



Fig.15

EXHIBIT C

-64-

US 6,807,166 B1

1

# GATEWAY FOR INTERNET TELEPHONE

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to a gateway, and particularly, to a gateway for an internet telephone system and software installed in terminals connected to the gateway.

### 2. Description of the Related Art

FIG. 1 shows an internet telephone system.

An end user of the internet telephone system employs a personal computer (hereinafter referred to as PC) or a telephone. There are four patterns of terminal-to-terminal connection in the internet telephone system:

1) PC→PC (21)
2) PC→gateway→telephone (22)
3) telephone→gateway→PC (23)
4) telephone→gateway→gateway→telephone (24)

The PCs 11 and 13 must have software such as Netmeeting (registered trademark) to use the internet telephone system. The public telephones 14 and 19 must have the gateways (GWs) 16 and 17 to use the internet telephone system. The gateways 16 and 17 are installed in, for example provider centers and are connected to telephone networks 15 and 18, to carry out conversion between voice signals and packet signals and connections between the telephone networks 15 and 18 and the Internet 12.

Internet telephone software and gateways have been based on individual specifications devised by their producers. As a result, the use of the internet telephone system is restricted to parties that employ the same software and apparatuses. Recently, VoIP (Voice over the Internet Protocol Forum) started to standardize internet telephone connection among different software and apparatuses and proposed Recommendation H.323 as a standardization base.

ITU-T (International Telecommunication Union Telecommunication Standardization Sector) employs the Recommendation H.323 as an international standard for "Visual Telephone System and Apparatus for Service Quality Unguaranteed LAN" ("ITU-T H Series (related to audio, visual, and multimedia) Recommendations (Part 2)" issued by Zaidan Hojin Sin-Nippon ITU Kyokai). The Recommendation H.323 calls a PC having the above-mentioned software an "H.323 terminal" and the above-mentioned gateway "H.323 gateway" or simply "gateway."

Japanese Unexamined Patent Publication No. 09-168065 discloses a technique to use the internet telephone system of FIG. 1. This technique arranges a database in a server. The database relates user names, internet protocol (IP) addresses, and telephone numbers to one another. A call contains a receiver IP address. If a PC corresponding to the receiver IP address is unavailable to receive the call, or if internet telephone software installed in the PC is inactive, a telephone number corresponding to the PC is retrieved from the database, and the call is automatically connected to the telephone.

FIGS. 2A and 2B show examples of connection and callback operations in the internet telephone system of FIG. 1. The example of FIG. 2A shows the route 21 or 22 of FIG. 1, and the example of FIG. 2B shows the route 23 or 24 of FIG. 1.

In FIG. 2A, the PC 11 serves as a caller and has an IP address [a.a.a.a], and the PC 13 or gateway 17 serves as a receiver and has an IP address [b.b.b.b]. The PC 11 sends the IP address [a.a.a.a] to the PC 13 or gateway 17. The PC 13 or gateway 17 makes a callback with the IP address [a.a.a.a] of the caller.

2

In FIG. 2B, the telephone 14 has a telephone number [3000]. When the telephone 14 makes a call, the gateway 16 having an IP address [g.g.g.g] sends the IP address [g.g.g.g] and telephone number [3000] to the PC 13 or gateway 17. The PC 13 or gateway 17 makes a callback with the caller IP address [g.g.g.g] and telephone number [3000].

In these examples, the IP addresses are global IP addresses so that the PCs 11 and 13 and gateways 16 and 17 are uniquely identifiable. The receivers 13 and 17 are able to correctly specify the callers 11 and 14 when making a callback

As is apparent in the routes 21 and 22, the PC 11, for example, is directly connected to the Internet 12, and therefore, the PC 11 separately keeps a log of internet telephone calls. If a party uses the internet telephone system with many PCs, it is difficult for the party to centrally grasp the use by the PCs of the internet telephone system.

There is a serious shortage of global IP addresses these days. To solve this problem, DHCP (Dynamic Host Configuration Protocol) and private IP addresses are increasingly used. A DHCP server dynamically (instead of fixedly) assigns a global IP address (only one in the world) to a PC when the PC is activated. On the other hand, the private IP addresses are fixedly assigned to PCs in a private LAN and are usable only within the LAN. The private IP addresses are prohibited from being disclosed to the Internet that is public.

As a result, an outside party is unable to call through the internet telephone system a PC in the LAN that employs DHCP or private IP addresses.

In addition, a PC in the LAN that employs private IP addresses is unable to call an outside party through the internet telephone system because the private IP addresses are not allowed to be transmitted as caller addresses to the outside. A PC in the LAN that uses DHCP may call an outside party through the internet telephone system because it is temporarily provided with a global IP address from a DHCP server. The outside party, however, is unable to make a callback because the global IP address is temporary.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide a gateway for an internet telephone system, capable of 1) efficiently managing PCs and telephones connected to private networks so that they may use the internet telephone system and 2) enabling PCs and telephones that have DHCP IP addresses or private IP addresses to use the internet telephone system

In order to accomplish the objects, the present invention provides a gateway for an internet telephone system, having a LAN receiver for processing an incoming call from the Internet or a PC, a line receiver for processing an incoming call from a telephone, a LAN transmitter for processing an outgoing call to the Internet or a PC according to a request from the line receiver, a line transmitter for processing an outgoing call to a telephone according to a request from the LAN receiver, a retrieval unit for retrieving the address of a receiver gateway according to a request from the line receiver, and a logger for logging information about calls according to requests from the LAN transmitter and line transmitter.

If the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies a receiver IP address, the LAN receiver requests the LAN transmitter to make a call based on the incoming call, and the LAN transmitter requests the logger to log information about the call.

If the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies a receiver

EXHIBIT C                                                  -65-

US 6,807,166 B1

3

telephone number that is outside the domain of the gateway, the LAN receiver retrieves an IP address assigned to a gateway corresponding to the receiver telephone number from the retrieval unit and requests the LAN transmitter to make a call based on the incoming call and retrieved gateway IP address.

The LAN receiver has a first table for registering IP addresses assigned to PCs that are within the domain of the gateway, telephone numbers corresponding to the PCs, and reception enabled/disabled states of the PCs. If the LAN receives an incoming call from a LAN and if the incoming call accompanies a receiver telephone number that is within the domain of the gateway, the LAN receiver retrieves an IP address assigned to a PC corresponding to the receiver telephone number from the first table, and if the PC is in a reception enabled state, requests the LAN transmitter to make a call based on the incoming call and retrieved IP address.

If the PC is in a reception disabled state or fails to receive the call, the LAN receiver requests the line transmitter to make a call based on the incoming call and accompanied receiver telephone number. An IP address assigned to any PC that is within the domain of the gateway is one assigned by a DHCP server or is a private IP address.

Receiving an IP address from the DHCP server, a PC in the domain of the gateway notifies the gateway of the IP address and a telephone number related to the PC so that the gateway may register the IP address and telephone number in the first table. Each PC in the domain of the gateway notifies the gateway of the enabled/disabled state of internet telephone software installed in the PC whenever it is enabled or disabled.

The LAN transmitter has a second table for registering IP addresses assigned to PCs that are within the domain of the gateway and telephone numbers corresponding to the PCs. If the LAN transmitter receives a call request from the LAN receiver and if the request accompanies a caller IP address that is not a global IP address, the LAN transmitter retrieves a telephone number corresponding to the caller IP address from the second table and replaces the caller IP address with an IP address assigned to the gateway plus the retrieved telephone number.

The caller IP address may be an IP address assigned by the DHCP server or a private IP address. Receiving an IP address from the DHCP server, a PC in the domain of the gateway notifies the gateway of the IP address and a telephone number related to the PC so that the gateway may register the IP address and telephone number in the second table. According to the present invention, every call from every PC is made through the gateway.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be more clearly understood from the description as set forth below with reference to the accompanying drawings, in which:

FIG. 1 shows an internet telephone system according to the prior art;

FIGS. 2A and 2B show connection and callback operations in the internet telephone system of FIG. 1;

FIG. 3 shows an internet telephone system employing gateways according to the present invention;

FIG. 4 shows a basic structure of a gateway according to the present invention;

FIGS. 5A and 5B show tables employed by the gateway of FIG. 4;

4

FIG. 6 shows the operation of the gateway of FIG. 4 when handling an incoming call to a telephone that is within the domain of the gateway;

FIG. 7 shows the operation of the gateway of FIG. 4 when handling incoming calls to a telephone and PC that are outside the domain of the gateway;

FIG. 8 shows the operation of the gateway of FIG. 4 when handling an incoming call to a PC that is within the domain of the gateway;

FIG. 9 shows the operation of the gateway of FIG. 4 when handling an outgoing call from a PC;

FIG. 10 shows data transferred among units in an internet telephone system;

FIG. 11 shows examples of data transferred in the system of FIG. 10;

FIGS. 12A and 12B show a process flow of a LAN receiver of the gateway of FIG. 4;

FIG. 13 shows a process flow of a LAN transmitter of the gateway of FIG. 4;

FIG. 14 shows a process flow of a PC connected to the gateway of FIG. 4; and

FIG. 15 shows a CATV station employing the gateway of the present invention.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. 3 shows an internet telephone system employing gateways according to the present invention and connections between caller terminals and receiver terminals in the system.

A part above a dot-and-dash line corresponds to a conventional connection scheme, and a part below the line shows a connection scheme characteristic of the present invention. The scheme characteristic to the present invention will be explained.

The present invention connects a PC serving as a caller to an external network 12 or 18 always through one of gateways 16-a to 16-c, to centrally control the use by PCs of the internet telephone system. Although the gateways are connected to PCs in a one-to-one manner in FIG. 3 for the sake of explanation, the gateways 16-a to 16-c, 16-1, and 16-2 may be integrated into one gateway.

Unlike the prior art, the present invention is capable of realizing a LAN-to-LAN connection. Namely, the present invention can connect a PC to a gateway, and then, from the gateway to a PC as indicated with 25-a, 25-b, and 25-c. This means that the gateway of the present invention has a router function. The caller side and the receiver side each involve a private network area indicated with (*1) and, in the private network area, there is no need to assign fixed global IP addresses to PCs. Instead, private IP addresses are assigned to the PCs, and the PCs can use the internet telephone system with the private IP addresses.

FIG. 4 shows a basic structure of the gateway 40 of the present invention for the internet telephone system, and FIGS. 5A and 5B show tables 1 and 2 used by the gateway 40.

FIGS. 6 to 9 show the operation of the gateway 40.

The operation of the gateway 40 of achieving conventional functions (above the dot-and-dash line of FIG. 3) will be explained.

An incoming call from the Internet arrives at a LAN interface 43 and is processed as indicated with continuous arrow marks in FIG. 4. The incoming call is transferred to

EXHIBIT C                                                    -66-

US 6,807,166 B1

5

a LAN receiver 44, and a user related to the incoming call is authenticated in an authentication unit 41 in which users are registered in advance. The LAN receiver 44 requests a line transmitter 48 to make a call based on the incoming call, and the line transmitter 48 makes a call to a telephone linked to the receiver of the incoming call. A logger 49 logs information about the call after the completion of the call.

An incoming call from a line arrives at a line interface 46 and is processed as indicated with dotted arrow marks. The incoming call is transferred to a line receiver 45, and a user related to the incoming call is authenticated in the authentication unit 41. If a receiver of the incoming call is a telephone number, an address of a gateway that manages the telephone number is retrieved from a retrieval unit 42 according to the telephone number. The line receiver 45 requests a LAN transmitter 47 to make a call based on the incoming call and retrieved gateway address. The LAN transmitter 47 makes a call to the gateway address. The logger 49 logs information about the call after the completion of the call.

The operation of functional parts (shaded parts in FIG. 4) characteristic to the present invention will be explained.

According to the present invention, at least a caller (a PC 51 in FIG. 4) must use the gateway 40 of the present invention when making a call through the internet telephone system. The gateway 40 processes the call depending on a receiver (a telephone number or an IP address) of the call. The logger 49 logs information about the call.

FIG. 6 shows the operation of the gateway 40 when handling an incoming call to a telephone that is within the domain of the gateway 40.

The LAN receiver 44 receives the incoming call from a PC 51. The authentication unit 41 authenticates a user related to the incoming call. If a receiver of the incoming call is a telephone number [2000] that is within the domain of the gateway 40, the LAN receiver 44 requests the line transmitter 48 to make a call based on the incoming call. The line transmitter 48 connects the call to a telephone 54 having the telephone number [2000]. On the completion of the call, the logger 49 logs information about the call.

FIG. 7 shows the operation of the gateway 40 when handling incoming calls to a telephone and PC that are outside the domain of the gateway 40.

A part above a dotted line of FIG. 7 relates to the handling of an incoming call to a telephone number that is outside the domain of the gateway 40. The LAN receiver 44 receives the incoming call from a PC 51. The incoming call has a receiver telephone number [06-123-4567] that is outside the domain of the gateway 40. The LAN receiver 44 retrieves an IP address [a.b.c.d] assigned to a gateway that manages a station number [06] from the retrieval unit 42.

The LAN receiver 44 requests the LAN transmitter 47 to make a connection to a telephone 56 having the telephone number [123-4567] in the domain of the gateway 55 having the IP address [a.b.c.d]. The LAN transmitter 47 makes a call according to the request. After the completion of the call, the logger 49 logs information about the call.

A part below the dotted line of FIG. 7 relates to the handling of an incoming-call to an IP address that is outside the domain of the gateway 40. The LAN receiver 44 receives the incoming call from the PC 51. When incoming call has a receiver IP address [w.x.y.z] assigned to a PC 52 that is outside the domain of the gateway 40. The LAN receiver 44 requests the LAN transmitter 47 to make a connection to the PC 52 having the IP address [w.x.y.z]. The LAN transmitter 47 makes the connection, and after the completion of the call, the logger 49 logs information about the call

6

FIG. 8 shows the operation of the gateway 40 when handling an incoming call to a PC that is within the domain of the gateway 40.

An incoming call to a telephone 54 that is within the domain of the gateway 40 arrives from a PC 51. The gateway 40 switches the call to a PC 52 because the PC 52 is related to the telephone 54 in the gateway 40.

Before this switching operation, the following a) and b) must be completed:

a) After starting internet telephone software, the PC 52 must notify the gateway 40 of an IP address [X.X.X.Y] assigned to the PC 52, the telephone number [2000] of the telephone 52 related to the PC 52, and a reception enabled state established by the activation of the software.

b) The notification is received by the LAN receiver 44, which registers the contents of the notification in the table 1 of FIG. 5A.

In the case of FIG. 6, the gateway 40 directly calls the telephone 54 in response to the incoming call with the telephone number [2000]. In the case of FIG. 8, the LAN receiver 44 refers to the table 1 to see if the telephone number [2000] attached to the incoming call is related to a PC and if the PC is in a reception enabled state. If there is a related PC and if the PC is available, the LAN receiver 44 retrieves an IP address [X.X.X.Y] assigned to the PC and requests the LAN transmitter 47 to make a connection to the PC 52 having the IP address [X.X.X.Y] like the case below the dotted line of FIG. 7. If the PC 52 is in a reception disabled state or if the connection to the PC 52 is unsuccessful, the line transmitter 48 calls the telephone 54 according to the telephone number [2000] like the case of FIG. 6. The logger 49 logs information about the call.

In this way, any incoming call from the outside (the Internet) is received through the gateway 40 of the present invention so that an outside party may directly make an internet telephone call through the Internet to any PC that is within the domain of the gateway 40 and that has an IP address assigned by a DHCP server or a private IP address.

FIG. 9 shows the operation of the gateway 40 when handling an outgoing call from a PC that is within the domain of the gateway 40.

A PC 51 in the domain of the gateway 40 issues an outgoing call whose receiver is a gateway 55 or PC 52 that are outside the domain of the gateway 40, through the Internet, and the receiver makes a callback.

In the prior art of FIGS. 2A and 2B, a direct call from the PC 11 accompanies the global IP address [a.a.a.a] assigned to the PC 11 as a caller address, and a call from the telephone 14 made through the gateway 16 accompanies the global IP address assigned to the gateway 16 and the telephone number of the telephone 14, i.e., [g.g.g.g]+[3000].

On the other hand, the present invention of FIG. 9 works as follows:

a) The caller PC 51 is in a private network and has an IP address assigned by a DHCP server or a private IP address instead of a global IP address.

b) The PC 51 has a corresponding telephone 57 having a telephone number [3000].

c) When activated, the PC 51 notifies the gateway 40 of the IP address assigned by the DHCP server.

The gateway 40 registers the notified IP address and the telephone number [3000] of the telephone 57 corresponding to the PC 51 in the table 2 (FIG. 5B) in the LAN transmitter 47. If the PC 51 has a fixed private IP address, there is no need of notifying the gateway 40 of the same. Instead, the

EXHIBIT C

US 6,807,166 B1

7

private IP address and the corresponding telephone number
are registered in the table 2 beforehand.

The PC 51 has, for example, a private IP address [p.p.p.p].
An outgoing call from the PC 51 is received by the LAN
receiver 44, which requests the LAN transmitter 47 to make
a call as shown in FIG. 7. At this time, the LAN transmitter
47 retrieves the telephone number [3000] from the table 2
according to the private IP address [p.p.p.p]. Then, the LAN
transmitter 47 transmits, as a caller address, the IP address
[g.g.g.g] assigned to the gateway 40 plus the telephone
number [3000] to the PC 55 or gateway 52 having an IP
address [b.b.b.b].

In this way, an outgoing call from the PC 51 having an IP
address allocated by the DHCP server or a private IP address
instead of a global IP address is handled by the gateway 40
so that the call may accompany the global IP address
assigned to the gateway 40 and the telephone number
corresponding to the PC 51. The present invention enables
any PC having a private IP address to issue an internet
telephone call to the outside and enables a receiver of the
call to make a callback with the use of the global IP address
[g.g.g.g] of the gateway 40 and the telephone number [3000]
attached to the call.

FIG. 10 shows data transferred among units in an internet
telephone system.

FIG. 11 shows examples of data transferred according to
the present invention in the system of FIG. 10.

In FIG. 10, a PC A (51) is linked to a telephone 57 having
a telephone number "a" and a PC D (52) to a telephone 54
having a telephone number "d". The PCs A and D have no
fixed global IP addresses.

In FIG. 11, IP packets 61 to 66 are transferred between the
PCs A and D. In each of the packets, "Caller IP" and
"Receiver IP" are in a header field and "Caller address"
and"Receiver address" are in a data field. The "Caller IP"
and "Receiver IP" contain IP addresses assigned to a caller
and receiver that are directly connected to each other. The
"Caller address" contains information to identify the caller,
i.e., the PC A. The "Receiver address" contains information
to identify the receiver, i.e., the telephone 54 or PC D
connected to a gateway C.

The packet 61 is transmitted from the caller PC A to a
caller gateway B and contains the IP address of the PC A in
"Caller address" and the IP address of the receiver gateway
C and the receiver telephone number d in "Receiver
address." As shown in FIG. 9, the gateway B retrieves the
telephone number "a" from the table 2 according to the IP
address of the PC A and replaces the data in "Caller address"
with the IP address of the gateway B plus the telephone
number "a", thereby preparing the packet 62.

As shown in FIG. 8, the gateway C retrieves the PC D
from the table 1 according to the receiver telephone number
"d" and checks to see if the PC D is in a reception enabled
state. If it is in the reception enabled state, the gateway C
transmits the packet 63 with "Receiver address" having the
IP address of the PC D. When the PC D makes a callback to
the PC A, the received "Caller address" containing the IP
address of the gateway B plus the telephone number "a" is
written in "Receiver address" to prepare the packet 64.
Thereafter, the sequences of FIGS. 8 and 9 are carried out to
call back the PC A.

FIGS. 12A and 12B are a flowchart showing the operation
of the LAN receiver 44 of the gateway 40 according to the
present invention.

FIG. 13 is a flowchart showing the operation of the LAN
transmitter 47 of the gateway 40 according to the present
invention.

8

FIG. 14 is a flowchart showing steps to be taken by a PC
when starting internet telephone software according to the
present invention.

In each of the flowcharts, a part related to the present
invention is surrounded with a dotted line to separate it from
parts related to the prior art.

In steps S101 to S103 of FIG. 12A, the LAN receiver 44
receives an incoming call from a LAN, authenticates a user
of the call, and determines whether a receiver address
contained in the call is an IP address or a telephone number.
If it is an IP address (below the dotted line of FIG. 7), the
LAN receiver 44 requests the LAN transmitter 47 to make
a call and follows the call in steps S116 to S118. If the
receiver address is a telephone number that is outside the
domain of the gateway 40 (above the dotted line of FIG. 7),
the LAN receiver 44 retrieves an IP address assigned to a
gateway that controls the telephone number from the
retrieval unit 42, requests the LAN transmitter 47 to make a
call, and follows the call in steps S112 to S115.

If the receiver address is a telephone number that is within
the domain of the gateway 40 (FIG. 8), the LAN receiver 44
retrieves a PC corresponding to the telephone number from
the table 1 and determines whether or not the PC is in a
reception enabled state in step S105. If the PC is in the
reception enabled state, the LAN receiver 44 requests the
LAN transmitter 47 to make a call according to the retrieved
IP address of the PC, and follows the call in steps S109 to
S111. If the PC is not in the reception enabled state, the LAN
receiver 44 requests the line transmitter 48 to make a call to
the telephone number as shown in FIG. 6 in steps S106 to
S108.

In FIG. 13, the LAN transmitter 47 receives a call request
from the LAN receiver 44 and checks to see if an IP address
assigned to a caller is a fixed global IP address in steps S201
and S202. If it is not the global IP address (FIG. 9), the LAN
transmitter 47 retrieves a telephone number corresponding
to the caller IP address from the table 2 and replaces the
caller IP address with the IP address of the caller gateway
plus the corresponding telephone number in steps S203 and
S204. If the caller IP address is the fixed global IP address,
it is used as it is. Thereafter, the LAN transmitter 47
proceeds with a call process in steps S205 to S207. After the
completion of the call, the LAN transmitter 47 requests the
logger 49 to log information about the call in step S208.

In FIG. 14, a PC is turned on and acquires an IP address
from the DHCP server in steps S301 and S302. If the PC is
provided with a fixed global IP address or a private IP address,
step S302 is not necessary. The PC notifies the gateway 40
of a corresponding telephone number, the acquired IP
address, and a reception enabled/disabled state before or
after starting internet telephone software in steps S303 and
S304. Before staring the software, the gateway 40 and the
corresponding telephone number must be written in the
software in step S300.

According to the notification from the PC, the gateway 40
registers necessary information in the tables 1 (FIG. 5A) and
2 (FIG. 5B). Steps S305 to S310 that follow are the same as
those of standard internet telephone software. When the
software is terminated, the PC may notify the gateway 40 of
a reception disabled state and a deletion of the IP address
assigned to the PC in step S311. This step S311 is not
essential because the gateway 40 transfers a call to the
corresponding telephone if the PC returns no answer.

FIG. 15 shows a CATV station employing the gateway 40
of the present invention.

The CATV station incorporates the gateway 40 of the
present invention, a private telephone exchange 71 such as

EXHIBIT C

US 6,807,166 B1

9

a PBX, and a CAM (Communication Access Master) 72. The CAM 72 is a server to carry out data communication through CATV transmission lines. A subscriber has a PC 51 and a corresponding telephone 57 that are connected to the CAM 72 through a cable. The PC 51 and telephone 57 are connected to a CAU (Communication Access Unit) 73 having a 10BASE-T interface and an analog telephone interface.

The PC 51 transmits and receives (81 and 82) internet telephone signals through the CAM 72 and the LAN interface of the gateway 40, or through the CAU 73 and the line interface of the gateway 40. To use the internet telephone system through the CAU 73, i.e., to achieve a so-called CATV telephone, the CAU 73 is connected to the PC 51 and telephone 57 so that an IP address assigned to the PC 51 is uniquely related to the telephone number of the telephone 57. Namely, the above-mentioned forms of use of the gateway 40 of the present invention for the internet telephone system are applicable as they are to the CATV telephone system. A standard CATV network usually employs IP addresses provided by a DHCP server or private IP addresses, and therefore, the gateway 40 of the present invention is effective to the CATV telephone system.

As explained above, the present invention has the following advantages:

1) The present invention passes all internet telephone calls made by PCs through the gateway of the present invention and, therefore, the gateway can centrally collect information about the calls. This is useful for a manager who controls the PCs and gateway.

2) Standard telephones are advantageous in that they are ready to accept calls all the time if they are not busy. Internet telephone software on PCs is advantageous in that users can carry on conversations while sharing information displayed on the PCs. The present invention is practical because it preferentially connects a call to a PC if the PC is in a reception enabled state.

3) The present invention authenticates a sender of a call in a sender gateway. Authentication of a receiver of the call is carried out in a receiver gateway. Accordingly, the sender gateway may keep only information about the receiver gateway and is not required to keep information about all the PCs that are in the domain of the receiver gateway. This reduces the quantity of authentication data to be stored in each gateway and labor for maintenance of the gateways.

4) The present invention enables a PC having an IP address assigned by a DHCP server or a private IP address instead of a fixed global IP address to send and receive internet telephone calls.

5) The present invention enables a PC to make a callback to an internet telephone call made by a PC having an IP address assigned by a DHCP server or a private IP address instead of a fixed global IP address.

6) The present invention writes information about a PC into the gateway of the present invention whenever the PC starts internet telephone software. If an IP address assigned to the PC or a telephone number related to the PC is changed, the information about the PC written in the gateway is automatically updated by updating the information on the PC.

What is claimed is:

1. A gateway for an internet telephone system to which one or more terminals having respective telephone numbers and IP addresses assigned by implementing a DHCP are connected within the domain of the gateway, comprising:

a registration table for translating between a telephone number and an IP address, both of which are assigned to one of the one or more terminals;

10

a retrieving means for retrieving the telephone number from the registration table based on the IP address of an originating terminal, and retrieving the IP address of a destination terminal from the registration table based on a telephone number included in a received IP packet;

a transmitting means for transmitting outside of the domain an IP packer including the retrieved telephone number of the originating terminal; and

a receiving means for receiving from outside of the domain an IP packet including a telephone number, and specifying a destination terminal of the received IP packet from the retrieved IP address of the destination terminal.

2. The gateway according to claim 1, further comprising a means for logging information about the call.

3. A gateway for an internet telephone system, comprising:

a LAN receiver for processing an incoming call from the Internet or a personal computer;

a line receiver for processing an incoming call from a telephone;

a LAN transmitter for processing an outgoing call to the Internet or a personal computer according to a request from the line receiver;

a line transmitter for processing an outgoing call to a telephone according to a request from the LAN receiver;

a retrieval unit for retrieving the address of a receiver gateway according to a request from the line receiver; and

a logger for logging information about calls according to requests from the LAN transmitter and line transmitter, wherein, if the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies a receiver IP address,:

the LAN receiver requests the LAN transmitter to make a call based on the incoming call; and

the LAN transmitter requests the logger to log information about the call; wherein:

the LAN receiver has a first table for registering IP addresses assigned to personal computers that are within the domain of the gateway, telephone numbers related to the personal computers, and reception enabled/disabled states of the personal computers; and

if the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies a receiver telephone number that is within the domain of the gateway, the LAN receiver retrieves an IP address from the first table according to the receiver telephone number, and if a personal computer having the retrieved IP address is in a reception enabled state, requests the LAN transmitter to make a call based on the incoming call and the retrieved IP address.

4. The gateway of claim 3, wherein an IP address assigned to any personal computer that is within the domain of the gateway is one provided by a DHCP server or a private IP address.

5. The gateway of claim 4, wherein each personal computer within the domain of the gateway notifies the gateway of the enabled/disabled state of internet telephone software whenever the personal computer starts or stops the software so that the gateway may register the enable/disabled state in the first table.

6. The gateway of claim 4, wherein each personal computer within the domain of the gateway notifies the gateway

EXHIBIT C

-69-

US 6,807,166 B1

11

of an IP address and a corresponding telephone number whenever the IP address is assigned to the personal computer so that the gateway may register the IP address and telephone number in the second table.

7. The gateway of claim 4, wherein each personal computer within the domain of the gateway notifies the gateway of an IP address and a corresponding telephone number whenever the IP address is assigned to the personal computer so that the gateway may register the IP address and telephone number in the first table.

8. The gateway of claim 7, wherein each personal computer within the domain of the gateway notifies the gateway of the enabled/disabled state of internet telephone software whenever the personal computer starts or stops the software so that the gateway may register the enabled/disabled state in the first table.

9. The gateway of claim 7, wherein an IP address to be assigned to a personal computer is one assigned by a DHCP server or a private IP address.

10. The gateway of claim 3, wherein, if the personal computer is in the reception disabled state or fails to receive the call, the LAN receiver requests the line transmitter to make a call based on the incoming call and accompanied receiver telephone number.

11. The gateway of claim 3, wherein an IP address to be assigned to a personal computer that is within the domain of the gateway is one assigned by a DHCP server or a private IP address.

12. The gateway of claim 11, wherein each personal computer within the domain of the gateway notifies the gateway of the enabled/disabled state of internet telephone software whenever the personal computer starts or stops the software so that the gateway may register the enabled/disabled state in the first table.

13. The gateway of claim 11, wherein each personal computer within the domain of the gateway notifies the gateway of an IP address and a corresponding telephone number whenever the IP address is assigned to the personal computer so that the gateway may register the IP address and telephone number in the second table.

14. The gateway of claim 11, wherein each personal computer within the domain of the gateway notifies the gateway of an IP address and a corresponding telephone number whenever the IP address is assigned to the personal computer so that the gateway may register the IP address and telephone number in the first table.

15. The gateway of claim 14, wherein each personal computer within the domain of the gateway notifies the

12

gateway on the enabled/disabled state of internet telephone software whenever the personal computer starts or stops the software so that the gateway may register the enabled/disabled state in the first table.

16. The gateway of claim 14, wherein an IP address to be assigned to a personal computer is one assigned by a DHCP server or a private IP address.

17. A gateway for an internet telephone system, comprising:

a LAN receiver for processing an incoming call from the Internet or a personal computer;

a line receiver for processing an incoming call from a telephone;

a LAN transmitter for processing an outgoing call to the Internet or a personal computer according to a request from the line receiver;

a line transmitter for processing an outgoing call to a telephone according to a request from the LAN receiver;

a retrieval unit for retrieving the address of a receiver gateway according to a request from the line receiver; and

a logger for logging information about calls according to requests from the LAN transmitter and line transmitter, wherein, if the LAN receiver receives an incoming call from a LAN and if the incoming call accompanies a receiver IP address,:

the LAN receiver requests the LAN transmitter to make a call based on the incoming call; and

the LAN transmitter requests the logger to log information about the call; wherein:

the LAN transmitter has a second table for registering IP addresses assigned to personal computers that are within the domain of the gateway and telephone numbers related to the personal computers; and,

if the LAN transmitter receives a call request from the LAN receiver and if the call request accompanies a caller IP address that is not a global IP address, the LAN transmitter retrieves a telephone number corresponding to the caller IP address from the second table and replaces the caller IP address with an IP address assigned to the gateway plus the retrieved number.

18. The gateway of claim 17, wherein every outgoing call from the personal computers is made through the gateway.

* * * * *

EXHIBIT C

- 70 -

# EXHIBIT D

US007460558B2

(12) **United States Patent**
Anand

(10) **Patent No.:** **US 7,460,558 B2**
(45) **Date of Patent:** **Dec. 2, 2008**

(54) **SYSTEM AND METHOD FOR CONNECTION CAPACITY REASSIGNMENT IN A MULTI-TIER DATA PROCESSING SYSTEM NETWORK**

(75) Inventor: **Vaijayanthimala K. Anand**, Austin, TX (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 529 days.

(21) Appl. No.: **11/014,110**

(22) Filed: **Dec. 16, 2004**

(65) **Prior Publication Data**
US 2006/0133418 A1    Jun. 22, 2006

(51) **Int. Cl.**
*H04J 3/16* (2006.01)
*H04J 3/22* (2006.01)

(52) **U.S. Cl.** ..................................................... **370/468**
(58) **Field of Classification Search** ................. 370/428, 370/412–418, 468, 465, 464, 395.4, 395.41, 370/395.42, 395.43; 709/223, 276
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,633,916 B2 | 10/2003 | Kauffman |
| 6,717,949 B1 | 4/2004 | Boden et al. |
| 6,725,332 B2 | 4/2004 | Leenstra et al. |
| 6,741,559 B1 | 5/2004 | Smeulders et al. |
| 6,754,716 B1 | 6/2004 | Sharma et al. |
| 7,024,460 B2 | 4/2006 | Koopmas et al. |
| 7,093,288 B1 | 8/2006 | Hydrie et al. |

| | | | |
|---|---|---|---|
| 7,164,656 B2 | 1/2007 | Foster et al. | |
| 7,240,136 B2 | 7/2007 | Anand | |
| 2002/0194342 A1 | 12/2002 | Lu et al. | |
| 2003/0032390 A1 * | 2/2003 | Geile et al. | 455/3.05 |
| 2003/0172145 A1 * | 9/2003 | Nguyen | 709/223 |
| 2003/0225815 A1 | 12/2003 | Brenner et al. | |
| 2004/0177150 A1 | 9/2004 | Kogan | |
| 2005/0021491 A1 | 1/2005 | Horgan | |
| 2005/0053046 A1 | 3/2005 | Wang | |
| 2005/0111477 A1 * | 5/2005 | Ghanma et al. | 370/445 |
| 2005/0270993 A1 | 12/2005 | Rajamani et al. | |
| 2006/0129679 A1 * | 6/2006 | Hlasny | 709/227 |
| 2006/0168217 A1 | 7/2006 | Anand | |
| 2007/0104215 A1 * | 5/2007 | Wang et al. | 370/458 |

* cited by examiner

*Primary Examiner*—Ajit G Patel
(74) *Attorney, Agent, or Firm*—Duke W. Yee; Marilyn S. Dawkins; James O. Skarsten

(57) **ABSTRACT**

A method, computer program product, and a data processing system for data prioritization in a multi-tier network system is provided. A server having a plurality of processors receives data from a client. A priority of the client is then identified. Responsive to identifying the priority, the data is queued in a queue of a first plurality of queues associated with a first processor of the plurality of processors. The queue is one of a plurality of queues associated with the first processor and is associated with the priority. Additionally, mechanisms for reassigning connection capacity from one priority class to another priority class at the network layer in a multi-tier network system is provided. As the capacity of connections of one priority class approaches saturation, spare capacity may be reassigned from another class to the priority class approaching saturation between the first-tier systems. Additionally, mechanisms for replicating or mirroring the connection capacity reassignment between second-tier systems is provided.

**20 Claims, 9 Drawing Sheets**



EXHIBIT D

-71-



*FIG. 1*



*FIG. 2*

EXHIBIT D

-72-



*FIG. 3*

EXHIBIT D



*FIG. 4*



*FIG. 5*

EXHIBIT D

-74-



*FIG. 6*

**EXHIBIT D**



FIG. 7A

FIG. 7B



FIG. 7C



FIG. 8

950

*FIG. 9A*

| SOURCE ADDRESS | PRIORITY | CAPACITY |
|----------------|----------|----------|
| 9.3.194.7      | HIGH     | 100      |
| 9.3.194.9      | LOW      | 100      |

951 — 9.3.194.7
952 — 9.3.194.9

950

*FIG. 9B*

| SOURCE ADDRESS | PRIORITY | CAPACITY |
|----------------|----------|----------|
| 9.3.194.7      | HIGH     | 150      |
| 9.3.194.9      | LOW      | 50       |

951 — 9.3.194.7
952 — 9.3.194.9

*FIG. 9C*



*FIG. 9D*



EXHIBIT D



FIG. 10

EXHIBIT D

-79-

## FIG. 11



EXHIBIT D

US 7,460,558 B2

**1**

# SYSTEM AND METHOD FOR CONNECTION CAPACITY REASSIGNMENT IN A MULTI-TIER DATA PROCESSING SYSTEM NETWORK

## RELATED APPLICATIONS

This application is related to commonly assigned and co-pending U.S. patent application Ser. No. 11/014,070 now U.S. Pat. No. 7,240,136, entitled "SYSTEM AND METHOD FOR REQUEST PRIORITY TRANSFER ACROSS NODES IN A MULTI-TIER DATA PROCESSING SYSTEM NETWORK," and U.S. patent application Ser. No. 11/014,069, entitled "METHOD, COMPUTER PROGRAM PRODUCT, AND DATA PROCESSING SYSTEM FOR DATA QUEUING PRIORITIZATION IN A MULTI-TIERED NETWORK," which are hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

### 1. Technical Field

The present invention relates generally to an improved data processing system and, in particular, to a mechanism for data queue prioritization in a multi-tier network system. Still more particularly, the present invention provides a mechanism for queuing client data prioritized in a networked data processing system on a per-processor basis. Additionally, the present invention provides a mechanism for dynamically adjusting the priority of persistent connections between a mid-tier and backend data server at the network layer in a multi-tier network.

### 2. Description of Related Art

Various networked data processing system traffic control schemes for queuing and filtering network traffic are used for providing service level agreement (SLA) traffic prioritization. For example, the Linux network stack has infrastructure for traffic control that has queuing disciplines (qdisc) and filters. A hierarchy of qdiscs can be constructed jointly with a class hierarchy to support Quality of Service (QoS) features. Traffic can be routed to different classes by employing filters that are matched against packet header fields.

For receive side, that is the server side in a multi-tier network, prioritization is provided on a connection basis. For example, when an incoming connection is established, the connection may be prioritized based on one or more priority filters to queue the connection in one of a plurality of queues allocated to different priority classes. However, such queuing mechanisms rely on connection prioritizations. For example, in a network using the transport control protocol/Internet protocol (TCP/IP), a connection is established after completion of a three-phase process typically referred to as a three-way handshake. In such systems, prioritization is limited to granting or denying a connection based on a client priority level and, for example, network metrics such as traffic loads.

In implementations where prioritization is enforced only at the connection level, priority is enforced depending on the arrival of the incoming connections when multiple priority clients are serviced concurrently. For example, if the arrival of the connections are a mix of high and low priority connections then high priority connections are serviced prior to servicing the low priority connections. However, after the connections are established, all the connections are treated without any discrimination.

Additionally, SLA traffic prioritization may sometimes result in inefficient utilization of the overall network system transmission capacity. For example, the network system transmission capacity may be partitioned into capacities that

**2**

are respectively allocated to different traffic priority classes. In the event that one traffic priority class experiences a heavy load, the network system capacity allocated to that traffic priority class may become saturated, or consumed. In the event that a second traffic priority class experiences a traffic load below the capacity allocated to the second traffic priority class, an idle portion of the second traffic priority class capacity will be unused, while at the same time traffic of the first priority class may be blocked from transmission due to saturation of the first traffic priority class. In such a situation, the overall network transmission capacity is underutilized.

It would be advantageous to provide a mechanism for network-level prioritization for providing SLA prioritization queuing of inbound traffic at a server providing connectivity to clients of different priorities. It would be further advantageous to provide a mechanism for providing network-level prioritization in a multi-processor system of a multi-tier network for priority queuing of incoming traffic on a per-processor basis. It would further be advantageous to provide a mechanism to more efficiently utilize network transmission capacity in a network featuring SLA prioritization of traffic data.

## SUMMARY OF THE INVENTION

The present invention provides a method, computer program product, and a data processing system for data prioritization in a multi-tier network system. A server having a plurality of processors receives data from a client. A priority of the client is then identified. Responsive to identifying the priority, the data is queued in a queue of a first plurality of queues associated with a first processor of the plurality of processors. The queue is one of a plurality of queues associated with the first processor and is associated with the priority. Additionally, mechanisms for reassigning connection capacity from one priority class to another priority class at the network layer in a multi-tier network system based on changes in SLAs used for the first-tier setups to facilitate optimized utilization of the transmission capacity of a multi-tier network is provided. As the capacity of connections of one priority class approaches saturation, spare capacity may be reassigned from another class to the priority class approaching saturation between the first-tier systems. Additionally, mechanisms for replicating or mirroring the connection capacity reassignment between second-tier systems is provided.

## BRIEF DESCRIPTION OF THE DRAWINGS

The novel features believed characteristic of the invention are set forth in the appended claims. The invention itself, however, as well as a preferred mode of use, further objectives and advantages thereof, will best be understood by reference to the following detailed description of an illustrative embodiment when read in conjunction with the accompanying drawings, wherein:

FIG. 1 depicts a pictorial representation of a multi-tier network of data processing systems in which a preferred embodiment of the present invention may be implemented;

FIG. 2 is a block diagram of a data processing system that may be implemented as a server depicted in accordance with a preferred embodiment of the present invention;

FIG. 3 is a block diagram illustrating a client data processing system that may have data prioritized in accordance with a preferred embodiment of the present invention;

EXHIBIT D

-81-

US 7,460,558 B2

3

FIG. 4 is a diagrammatic illustration of a server configuration for enforcing data prioritization on a network level in accordance with a preferred embodiment of the present invention;

FIG. 5 is a data queue diagram configuration for service level agreement prioritization on a multi-processor server in a multi-tier network in accordance with a preferred embodiment of the present invention;

FIG. 6 is a flowchart of a data queuing routine run on a server in accordance with a preferred embodiment of the present invention;

FIG. 7A is a diagrammatic illustration of a multi-tier network system in which request priority transfers are implemented according to a preferred embodiment of the present invention;

FIG. 7B is a diagrammatic illustration of prioritized data queues configured to facilitate data processing prioritization transfer in a multi-tier network in accordance with a preferred embodiment of the present invention;

FIG. 7C is a diagrammatic illustration of a priority filter that facilitates transferring request priority classes across nodes in a multi-tier network of data processing systems in accordance with a preferred embodiment of the present invention;

FIG. 8 a flowchart of runtime processing performed by a priority filter for transferring request priorities across nodes in a multi-tier network in accordance with a preferred embodiment of the present invention;

FIG. 9A is a diagrammatic illustration of a priority filter that facilitates dynamic reassignment of connection capacities between connection priority classes in accordance with a preferred embodiment of the present invention;

FIG. 9B is a diagrammatic illustration of the priority filter shown in FIG. 9A after reassignment of connection capacity between connection priority classes in accordance with a preferred embodiment of the present invention;

FIG. 9C is a diagrammatic illustration of a web server, web application server, and a backend database server and connections therebetween in which connection capacity may be reassigned between priority classes in accordance with a preferred embodiment of the present invention;

FIG. 9D is a diagrammatic illustration of the web server, web application server, and the backend database server and connections therebetween depicted in FIG. 9C after connection capacity reassignment between priority classes has been performed in accordance with a preferred embodiment of the present invention;

FIG. 10 is a flowchart of a connection priority reassignment routine for reassigning connection capacity between different priority classes in accordance with a preferred embodiment of the present invention; and

FIG. 11 is a flowchart of a connection priority reallocation routine for reallocating connection capacity previously reassigned to another connection priority class in accordance with a preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

With reference now to the figures, FIG. 1 depicts a pictorial representation of a multi-tier network of data processing systems in which the present invention may be implemented. Network data processing system 100 is a network of computers in which the present invention may be implemented. Network data processing system 100 contains a network 102, which is the medium used to provide communications links between various devices and computers connected together

4

within network data processing system 100. Network 102 may include connections, such as wire, wireless communication links, or fiber optic cables. In the depicted example, web server 104 is connected to network 102 along with storage unit 107. In addition, clients 108, 110, and 112 are connected to network 102. These clients 108, 110, and 112 may be, for example, personal computers or network computers. In the depicted example, web server 104 may be implemented as an HTTP server that sends web pages to clients 108-112 responsive to receiving an HTTP request from, for example, browsers running on clients 108-112. Additionally, web server 104 may provide data other than HTTP data, such as applications, to clients 108-112. Clients 108, 110, and 112 are clients to web server 104. Web server 104 interfaces and communicates with web application server 105. Web application server 105 handles application operations between browser-issued requests issued by clients 108-112 and back end applications or databases maintained by data store 106, such as a backend database system, that interfaces with web application server 105.

Network data processing system 100 may include additional servers, clients, and other devices not shown. In the depicted example, network data processing system 100 is the Internet with network 102 representing a worldwide collection of networks and gateways that use the Transmission Control Protocol/Internet Protocol (TCP/IP) suite of protocols to communicate with one another. At the heart of the Internet is a backbone of high-speed data communication lines between major nodes or host computers, consisting of thousands of commercial, government, educational and other computer systems that route data and messages. Of course, network data processing system 100 also may be implemented as a number of different types of networks, such as for example, an intranet, a local area network (LAN), or a wide area network (WAN). FIG. 1 is intended as an example, and not as an architectural limitation for the present invention.

Referring to FIG. 2, a block diagram of a data processing system that may be implemented as a server, such as web server 104 or web application server 105 in FIG. 1, is depicted in accordance with a preferred embodiment of the present invention. Data processing system 200 may be a symmetric multiprocessor (SMP) system including a plurality of processors 202 and 204 connected to system bus 206 although other multi-processor configurations may be suitably substituted therefor. Also connected to system bus 206 is memory controller/cache 208, which provides an interface to local memory 209. I/O bus bridge 210 is connected to system bus 206 and provides an interface to I/O bus 212. Memory controller/cache 208 and I/O bus bridge 210 may be integrated as depicted.

Peripheral component interconnect (PCI) bus bridge 214 connected to I/O bus 212 provides an interface to PCI local bus 216. A number of modems may be connected to PCI local bus 216. Typical PCI bus implementations will support four PCI expansion slots or add-in connectors. Communications links to clients 108-112 in FIG. 1 may be provided through modem 218 and network adapter 220 connected to PCI local bus 216 through add-in connectors.

Additional PCI bus bridges 222 and 224 provide interfaces for additional PCI local buses 226 and 228, from which additional modems or network adapters may be supported. In this manner, data processing system 200 allows connections to multiple network computers. A memory-mapped graphics adapter 230 and hard disk 232 may also be connected to I/O bus 212 as depicted, either directly or indirectly.

Those of ordinary skill in the art will appreciate that the hardware depicted in FIG. 2 may vary. For example, other

EXHIBIT D

-82-

US 7,460,558 B2

5

peripheral devices, such as optical disk drives and the like, also may be used in addition to or in place of the hardware depicted. The depicted example is not meant to imply architectural limitations with respect to the present invention.

The data processing system depicted in FIG. 2 may be, for example, an IBM eServer pSeries system, a product of International Business Machines Corporation in Armonk, N.Y., running the Advanced Interactive Executive (AIX) operating system or LINUX operating system.

With reference now to FIG. 3, a block diagram illustrating a data processing system is depicted in which the present invention may be implemented. Data processing system 300 is an example of a client computer, such as client 108 shown in FIG. 1. Data processing system 300 employs a peripheral component interconnect (PCI) local bus architecture. Although the depicted example employs a PCI bus, other bus architectures such as Accelerated Graphics Port (AGP) and Industry Standard Architecture (ISA) may be used. Processor 302 and main memory 304 are connected to PCI local bus 306 through PCI bridge 308. PCI bridge 308 also may include an integrated memory controller and cache memory for processor 302. Additional connections to PCI local bus 306 may be made through direct component interconnection or through add-in boards. In the depicted example, local area network (LAN) adapter 310, SCSI host bus adapter 312, and expansion bus interface 314 are connected to PCI local bus 306 by direct component connection. In contrast, audio adapter 316, graphics adapter 318, and audio/video adapter 319 are connected to PCI local bus 306 by add-in boards inserted into expansion slots. Expansion bus interface 314 provides a connection for a keyboard and mouse adapter 320, modem 322, and additional memory 324. Small computer system interface (SCSI) host bus adapter 312 provides a connection for hard disk drive 326, tape drive 328, and CD-ROM drive 330. Typical PCI local bus implementations will support three or four PCI expansion slots or add-in connectors.

An operating system runs on processor 302 and is used to coordinate and provide control of various components within data processing system 300 in FIG. 3. The operating system may be a commercially available operating system, such as Windows XP, which is available from Microsoft Corporation. An object oriented programming system such as Java may run in conjunction with the operating system and provide calls to the operating system from Java programs or applications executing on data processing system 300. "Java" is a trademark of Sun Microsystems, Inc. Instructions for the operating system, the object-oriented programming system, and applications or programs are located on storage devices, such as hard disk drive 326, and may be loaded into main memory 304 for execution by processor 302.

Those of ordinary skill in the art will appreciate that the hardware in FIG. 3 may vary depending on the implementation. Other internal hardware or peripheral devices, such as flash read-only memory (ROM), equivalent nonvolatile memory, or optical disk drives and the like, may be used in addition to or in place of the hardware depicted in FIG. 3. Also, the processes of the present invention may be applied to a multiprocessor data processing system.

As another example, data processing system 300 may be a stand-alone system configured to be bootable without relying on some type of network communication interfaces As a further example, data processing system 300 may be a personal digital assistant (PDA) device, which is configured with ROM and/or flash ROM in order to provide non-volatile memory for storing operating system files and/or user-generated data.

6

The depicted example in FIG. 3 and above-described examples are not meant to imply architectural limitations. For example, data processing system 300 also may be a notebook computer or hand held computer in addition to taking the form of a PDA. Data processing system 300 also may be a kiosk or a Web appliance.

A client, such as client 108, initiates a communication connection with web server 104. In the illustrative examples provided herein, communication connections between a client and server are described with reference to the TCP/IP protocol suite, although other communication protocols may be suitably substituted therefor. Implementations of the present invention are not limited to any particular protocol and those described are provided only to facilitate an understanding of the invention.

FIG. 4 is a diagrammatic illustration of a server configuration for enforcing data prioritization on a network level in accordance with a preferred embodiment of the present invention. Server 400 is an example of a data processing system, such as data processing system 200 shown in FIG. 2, that provides connectivity to clients of different priority classes and is implemented as a multi-processor data processing system. A client, such as client 108, will initiate a communication connection with server 400 by first engaging in a handshake with server 400. To establish a connection, a client addresses frame 402 to server 400 and applies frame 402 to network media 410, e.g., a 10baseT, 100baseT, or other suitable network media. Frame 402 comprises various encapsulated headers. In the present example, the client and server connect over the Internet and thus frame 402 comprises a link header 402a, e.g., an Ethernet header, network layer header 402b, e.g., an IP header, and transport layer header 402c, e.g., a TCP header. For example, frame 402 may encapsulate a synchronization (SYN) segment comprising transport layer header 402c having an asserted SYN flag for initiating a handshake with server 400. Server 400 receives frame 402 via network interface card 420, e.g., an Ethernet card, that conveys the frame to link layer 431, e.g., an Ethernet driver, of network stack 430. Link layer 431 decapsulates, or demultiplexes, the IP datagram from the frame and passes the IP datagram to network layer 432 of network stack 430. Network layer 432 demultiplexes the TCP segment from the IP datagram and passes the TCP segment to transport layer 433 of network stack 430.

In accordance with a preferred embodiment of the present invention, filter 440 additionally receives the demultiplexed IP datagram for priority filtering of the imminent connection. Filter 440 preferably comprises logic for determining a priority-level of the client that originated the data. For example, filter 440 may determine a priority level of the client based on a source address, e.g., an IP source address, and port number read from the network layer header 402b in frame 402. The determination of the priority level is made by comparing one or more data values from frame 402 with pre-established criteria that is coded in, or accessed by, filter 440. In the illustrative example, filter 440 includes (or interfaces with) table 441 that associates or maps client addresses, e.g., IP network addresses, with priority levels that are associated with clients, for example according to service level agreements (SLAs) to which clients are subscribed. Table 441 is illustrative only and various other data structures that associate a client identifier, e.g., a network address, and a priority level may be suitably substituted therefor. As shown in FIG. 1, clients 108-112 having respective IP addresses of IP-A, IP-B and IP-C, and table 441 associates priority levels of low, low, and high, respectively, to clients 108-112. After (or concurrently with) identification of the client priority, the web server

US 7,460,558 B2

7

and client complete the connection, for example by completion of a three-way handshake. In accordance with a preferred embodiment of the present invention, traffic received by the web server after establishment of the connection with a client is priority filtered at a network layer on a per-processor basis in accordance with a client priority identified at connection of the client with the server.

FIG. 5 is a data queue diagram configuration for service level agreement prioritization on a multi-processor server in a multi-tier network in accordance with a preferred embodiment of the present invention. Data queue configuration 510 may be implemented as computer-readable instructions stored in a memory, such as local memory 209, and fetched therefrom by a processing unit, such as processor 202 or 204 shown in FIG. 2. In the illustrative example, assume web server 104 is a symmetric multi-processor system comprising n central processing units (designated CPU0-CPUn). In the illustrative example, each of processors CPU0-CPUn respectively have two queues allocated thereto for bi-level prioritization. Particularly, processor CPU0 has two queues 500$a$ and 500$b$ for bi-level prioritization queuing of data received by web server 104 from clients having one of two priority levels assigned thereto. In the present example, queue 500$a$ is allocated for data received from clients of a first (max) priority, and queue 500$b$ is allocated for frames received from clients of a low (max−1) priority. In the illustrative examples, queues of two priorities per processor are shown. However, the bi-level prioritization provided in the examples is illustrative only and is chosen to facilitate an understanding of the invention, and any number of processor queues and corresponding client priority levels may be substituted for the configuration shown.

In a similar manner, other processors within the web server have similarly configured queues. In the illustrative example, processor CPU1 has queue 501$a$ allocated for data received from high priority clients, and queue 501$b$ is allocated for data received from clients of a low priority. Likewise, processor CPUn has queues 502$a$-502$b$ allocated for respective data received from high and low priority clients.

FIG. 6 is a flowchart of a data queuing routine run on a server, such as server 400 shown in FIG. 4, providing prioritized services to clients in accordance with a preferred embodiment of the present invention. The priority queuing routine shown in FIG. 6 is executed at a network layer, for example within network stack 430 shown in FIG. 4. The routine begins and awaits receipt of data. On receipt of the data (step 602), an evaluation is made to determine that the data was targeted to the receiving system (step 604), e.g., by evaluation of the destination address in network layer header 402$b$. In the event the data was not destined for the receiving system, the data is dropped into a bit bucket or otherwise discarded (step 606), and the data queuing routine cycle ends (step 626).

Returning again to step 604, in the event that the data is destined to the receiving system, an evaluation is then made to determine if the data comprises traffic of an existing connection (step 607). For example, a source address and port number of the data may be read and compared with existing connection sockets. If the data is not part of an existing connection, a priority level of the client that originated the data is identified, and a connection with the client is established (step 609). The data queuing routine cycle then ends according to step 626.

Returning again to step 607, if the data is traffic of an existing connection, an evaluation is then made to determine if the data has affinity with any of the system CPUs (step 608). As referred to herein, data is said to have affinity with a

8

processor when the processor, or resources associated with the processor such as a cache system or the like, holds data, such as context data, necessary for processing of the data. If the data is identified as having affinity for any of the system processors, a priority of the data is then identified (step 610). For example, the source address of network layer header 402$b$ may be read and compared to a predefined criteria that correlates source addresses and priority levels as defined or accessed by filter 440 shown in FIG. 4. An evaluation of the priority is then made (step 612). In the event the data priority is evaluated as low at step 612, the data is placed in the low priority queue of the processor with which the frame is identified as having affinity (step 614), and the prioritization routine cycle then ends according to step 626. Alternatively, if the data is evaluated as high priority data at step 612, the data is placed in the high priority queue of the processor with which the data is identified as having affinity (step 616). The prioritization routine cycle then ends according to step 626.

Returning again to step 608, if the data is not identified as having affinity with any system processors, the priority level of the frame is then checked (step 618), and an evaluation is then made to determine if the data was originated from a client having a low priority (step 620). If it is determined that the data originated from a client having a low priority, a CPU is then chosen and the data is placed in a low priority queue of the chosen CPU (step 624). For example, a CPU chosen for queuing of the data may be made by a round robin selection routine. Other scheduling mechanisms may be suitably substituted therefor. Once the data is placed in a low priority queue of a CPU, the prioritization routine cycle then ends according to step 626.

Returning again to step 620, in the event that the data is identified as originating from a high priority client (that is, the client priority is not identified as a low priority at step 620), the data is placed in a high priority queue of one of the system processors (step 622), for example by selecting the processor that has the lowest number of tasks in its respective high priority queue. The prioritization routine cycle then ends according to step 626.

Data is then retrieved from the processor queues based on the queue priority for transmission of the data across the network. For example, data queued on a per-processor basis at web server 104 shown in FIG. 1 that comprises a database transaction to be performed on data store 106 is transmitted from web server 104 to web application server 105 according to the data prioritization, that is with processing precedence provided to higher priority requests with respect to lower priority requests.

Thus, the transmission of data during processing of a transaction in a multi-processor data processing system deployed in a multi-tier network is made in accordance with client priority classes. By allowing multiple queuing mechanisms at the data queue level in the TCP/IP network stack and correlating the connection priority with the data priority, higher priority clients are ensured to get requests serviced before a lower priority client.

In accordance with another embodiment of the present invention, a mechanism for extending or transferring request priorities from node-to-node in a multi-tier network system is provided. FIG. 7A is a diagrammatical illustration of a multi-tier network system in which data priority transfers are implemented according to a preferred embodiment of the present invention. In the illustrative example, a web server 704 implemented as an HTTP server sends web pages or other data to clients 708 and 709 by way of respective client connections 710 and 711 responsive to receiving HTTP requests therefrom. Additionally, web server 704 may provide data other

US 7,460,558 B2

9                                                                                          10

than HTTP data, such as applications, to clients 708 and 709. Web server 704 interfaces and communicates with web application server 705. Web application server 705 handles application operations between browser-issued requests issued by clients 708 and 709 and back-end applications or databases, such as back-end database server 706 that interfaces with web application server 705 and that executes database transactions on database 702.

In general, respective connections 710 and 711 between clients 708 and 709 and web server 704 are established as dynamic or short-lived connections. Connections 715a-715b and 720a-720b respectively interconnecting web server 704 with web application server 705 and web application server 705 with backend database server 706 are persistent connections. In accordance with a preferred embodiment of the present invention, a priority of a transaction request submitted by a client that is received at web server 704 is identified by web server 704 as described above. The priority is then propagated to a persistent connection with back-end database server 706. To this end, web server 704, during establishment of persistent connections 715a-715b with web application server 705, assigns priorities to connections 715a-715b. Likewise, application server 705, during establishment of persistent connections 720a and 720b with back-end database server 706, assigns priorities to connections 720a and 720b. In the illustrative example, each of connections 715a-715b and 720a-720b are representative of one or more similar connections. For example, connections 715a may be implemented as a pool of a plurality of connections each assigned (or collectively assigned) a common priority. In the present example, connections 715a and 720a are respectively representative of one or more connections of a first priority class, high (HI), and connections 715b and 720b are respectively representative of one or more connections of a second, lower priority class, low (LO).

Prioritized processing of client requests is provided by transferring, or extending, priority processing across all nodes involved in processing a client request. Each of the nodes involved in processing the transaction, e.g., web server 704, web application server 705, and backend database server 706, provides priority precedence in processing of data. For example, web server 704, on receipt of data from a client, identifies a priority of the client data by, for example, the mechanisms described above with respect to FIG. 4. Data is then queued and processed at web server 704 according to the data priority corresponding to the client priority level identified by web server 704. For example, assume web server 704 has received and queued both high priority data of a transaction request from a high priority client to be processed by backend database server 706 and low priority data of a transaction request from a low priority client to be processed by backend database server 706. The high priority data is transmitted to web application server 705 prior to transmission of the low priority data due to the processing precedence provided to the high priority client. Web application server 705, in turn, processes the data received from web server 704 according to the client data priority. In accordance with one embodiment of the present invention, web application server 705 priority processes data according to the connection on which the data is received at web application server 705. In the illustrative example, data received by web application sever 705 via HI priority connections 715a is placed in high priority queue 731a of (or interfaced with) priority filter 731, and data received by web application server via LO priority connections 715b is placed in low priority queue 731b of (or interfaced with) priority filter 731. Accordingly, high priority data processed and transmitted with precedence over low

priority data by web server 704 is likewise provided processing precedence by web application server 705. Web application server 705, in turn, transmits high priority data to backend database server 706 with precedence over low priority data. Thus, the backend system (backend database sever 706 in the present example) may queue and process high priority data with greater precedence over lower priority data. In the illustrative example, backend database server 706 places high priority data in high priority queue 707a of (or interfaced with) filter 707, and places low priority data in low priority queue 707b of (or interfaced with) priority filter 707. Thus, by configuring each node to identify data priority based on a connection by which the data is received, prioritized processing is provided across each tier involved in transaction processing in a multiple tiered data processing system network.

The priority of processing data is reciprocally provided in multi-tier network 700. That is, data received (e.g., return data resulting from execution of a database transaction by backend database server 706) by web application server 705 via a priority class HI connection 720a from backend database server 706 is provided greater processing precedence by web application server 705 than transactions received via priority class LO connections 720b. Likewise, data received by web server 704 from web application server 705 via HI priority connections 715a is provided greater processing precedence than data received by web server 704 from web application server 705 via low priority connections 715b. Thus, prioritization of transaction processing is provided in multi-tier network 700 during both transaction request and transaction return messaging.

With reference now to FIG. 7B, a diagrammatic illustration of prioritized data queues configured to facilitate data processing prioritization transfer in a multi-tier network is shown in accordance with a preferred embodiment of the present invention. Data queues 760a-762b may be implemented as computer-readable instructions stored in a memory, such as a local memory, and fetched therefrom by a processing unit of a server system deployed as a front-end node in multi-tier network 700. Data queues 760a-762b are preferably implemented within, or interface with, a priority filter, such as priority filter 730 run by web server 704. Data queues 760a-762b are examples of per-processor data queues, such as queues 500a-502b shown in FIG. 5, for frame-level data queuing as described above.

In the present example, high priority queues 760a, 761a, and 762a are logically mapped to high priority connections 715a, and low priority queues 760b, 761b, and 762b are logically mapped to low priority connections 715b. Logical mappings 770a-772b for associating respective queues 760a-762b with connections of a particularly priority may be implemented by, for example, a linked list, relational database, or any other suitable data structure. Thus, data queued in high priority queues 760a-762a to be transmitted to web application server 705 is provided precedence for transmission via high priority connections 715a over data queued in low priority queues 760b-762b for transmission via low priority connections 715b. In the illustrative examples, queues and connections of two priority classes are shown. However, the bi-level prioritization provided in the examples is illustrative only and is chosen to facilitate an understanding of the invention, and any number of queues and connection priority levels may be substituted for the configuration shown.

To facilitate transfer of processing priorities across nodes of multi-tier network 700, priority filters are implemented in each node involved in processing of the transaction. With reference now to FIG. 7C, a diagrammatic illustration of a priority filter that maps client connections to back-end con-

US 7,460,558 B2

**11**

nections for transferring priority classes across nodes in a multi-tier network of data processing systems is shown in accordance with a preferred embodiment of the present invention. Priority filter 731 is preferably implemented as a set of computer-readable instructions and may be implemented in, or interface with, a network stack of the host server, e.g., web application server 705, running priority filter 731.

In intermediate nodes, i.e., nodes that receive data to be processed and that must forward data to another node in multi-tier network 700, transfer of priority classes is facilitated by logical mappings between front-end and back-end server addresses. In the illustrative example, web application server 705 has two network addresses through which front-end connections may be made with web server 704, namely IP addresses 9.3.192.7 and 9.3.192.9, and web application server 705 has two network addresses through which back-end connections may be made with back-end database server 706, namely IP addresses of 9.3.190.7 and 9.3.190.9. In accordance with embodiments of the invention, priority classes are transferred from a requesting entity to a target entity via an intermediate server of multi-tier network 700 by way of mappings between prioritized connections. To this end, associations between web application server front-end addresses and back-end address are defined by filter 731. In the illustrative example, table 740 defines front-end (destination) addresses at which data is received by web application server 705, e.g., from web server 704 on behalf of clients 708 and 709 and corresponding priorities of the front-end addresses. Particularly, record 741 of table 740 defines a priority class of HI for requests received by web application server 705 with a destination address of 9.3.192.7, and record 742 of table 740 defines a priority class of LO for requests received by web application server 705 with a destination address of 9.3.192.9. Another table 750 defines source (back-end) addresses with which web application server 705 connects with back-end database server 706 and corresponding priorities for the back-end addresses. Particularly, record 751 of table 750 defines a priority class of HI for connections with back-end database server 706 established with the web application server source address of 9.3.190.7, and record 752 of table 750 defines a priority class of LO for connections with back-end database server 706 established with the web application server source address of 9.3.190.9. Thus, on identification of a priority of data received by web application server 705, the request priority may be transferred to the back-end database by sending the request on a connection that has a corresponding priority. For example, assume a request for a database query is issued by client 708 and is received by web application server 705 from web server 704. The request is analyzed to determine the destination address to which the request was directed. On identification of the destination address of the request, a priority of the request is determined based on the association of the destination address and priority class. Alternatively, the request priority may be identified by way of the connection on which the data is received by web application server 705. For example, web application server 705 may simply identify any data received over connections 715a as high priority data and any data received over connections 715b as low priority data.

Upon identification of the data priority, a source address that corresponds to the determined priority class is then identified and the request is communicated to the back-end service via the source address that has a corresponding priority.

As an example, assume a request from client 708 is sent to web application server 705 via web server 704 and that web server 704 connects with web application server 705 by

**12**

addressing a request to the low priority front-end address (9.3.192.9) of web application server 705. For example, web server 704 may connect with web application server 705 on low priority connection 715b that terminates at the low priority front-end address of web application server 705 after identifying client 708 as having a low priority SLA. Such an identification of client 708 may be made by a filter mechanism that identifies client priority SLAs, such as filter 441 shown and described in FIG. 4. On receipt of the request data by the web application server, the request is supplied to priority filter 731 and the front-end address at which the data was received by web application server 705 is read. In the present example, priority filter 731 reads the front-end address of web application server 705 to which the request was addressed and identifies the request as a LO priority address by way of the front end destination address and priority association defined in record 742.

On identification of the request as a LO priority request, web application server 705 then communicates the request to back-end database server 706. Particularly, web server 705 includes the low priority source address (9.3.190.9) in the request and supplies the request to low priority connection 720b for communication to back-end database server 706.

Accordingly, by implementing a priority filter in back-end database server 706 that queues requests according to the request priority, backend database server 706 may process requests according to predefined priority classes that have been originally identified at a front-end node of multi-tier network 700, e.g., web server 704, and that has been propagated through each node involved in conveying the transaction request to backend database server 706. In the illustrative example, back-end database server 706 includes priority filter 707 that provides a higher precedence to requests received over high priority connection 720a than requests received over low priority connection 720b. Particularly, priority filter 707 includes, or interfaces with, high priority queue 707a and low priority queue 707b in which requests received over respective high priority connections 720a and low priority connections 720b are queued. Accordingly, processing of requests received at back-end database server 706 may be performed according to priority classifications that are transferred between multiple tiers in a network of data processing systems.

FIG. 8 is a flowchart of runtime processing performed by a priority filter for transferring request according to request priorities across nodes in a data processing system network in accordance with a preferred embodiment of the present invention. The runtime routine processing depicted in flowchart 800 is preferably implemented by computer-readable instructions implemented as a filter, such as priority filter 730, that is processed by a data processing system, such as web application server 705 and is used to dispatch queued data from prioritized queues.

The runtime priority filter routine begins, for example, on system boot or another invocation, and awaits receipt of a request, such as a database transaction request or other back-end service transaction. On receipt of the request (step 802), e.g., upon dispatch from a queue, an evaluation of the request priority is made by the priority filter (step 804). In particular, the request is evaluated to determine if the request is a low priority request. In the event the request is evaluated as a low priority request, the run-time priority filter routine proceeds to evaluate whether a connection exists for LO priority requests (step 806). If a low priority connection does not exist, one is established (step 808) and the routine then proceeds to send the request on the newly established LO priority connection (step 810). If, at step 806, it is determined that a

EXHIBIT D

US 7,460,558 B2

13

LO priority connection already exists, e.g., low priority connections 720b in FIG. 7A, the runtime priority filter routine then proceeds to send the request on the LO priority connection according to step 810. After the request is send via the LO priority connection, the runtime priority filter cycle then completes (step 818).

Returning again to step 804, if the request is not evaluated as a LO priority request, an evaluation is made to determine if a HI priority connection exists (step 812). If a HI priority connection does not exist, one is established (step 814) and the routine then proceeds to send the request on the newly established HI priority connection (step 816). If, at step 812, it is determined that a HI priority connection already exists, e.g., high priority connections 720a, the runtime priority filter routine then proceeds to send the request on the HI priority connection according to step 816. After the request is sent via the HI priority connection, the runtime priority filter cycle then completes according to step 818.

Thus, by implementing data prioritization at the backend service, e.g., in filter 707, data processing priority is provided to clients of different priorities in a multi-tier network. For example, filter 707 may include high priority queue 707a and low priority queue 707b for providing processing precedence for data received over high priority connections 720a and low priority connections 720b.

It should be understood that the examples of bi-priority request filtering and priority transfers are illustrative only, and the teachings of the invention may be extended to a system having any number of request priority classes.

As described, embodiments of the present invention provide mechanisms for transferring request priorities across nodes in a network of data processing systems. By transferring request priorities across multiple nodes in a data processing system network, the precedence of request processing is ensured in any node involved in conveying or processing of a transaction in a multi-tiered data processing system network.

In accordance with another embodiment of the present invention, connections between two network nodes may have priorities dynamically reassigned for facilitating efficient network transmission capacity utilization. With reference again to FIGS. 7A and 7B, high priority connections 715a and 720a preferably comprise a plurality of respective connections that communicatively connect web server 704 with web application server 705 and web application server 705 with backend database server 706 used for conveyance therebetween of data classified as high priority. Low priority connections 715b and 720b preferably comprise a plurality of connections that communicatively connect web server 704 with web application server 705 and web application 705 with backend database server 706 for conveyance therebetween of data classified as low priority. That is, each of high priority connections 720a and low priority connections 720b comprise respective connection pools of high and low priority.

The number of high priority connections 715a and 720a and low priority connections 715b and 720b is limited by the network infrastructure capacity, e.g., by the particular network interface cards terminating high priority connections 715a and 720a and low priority connections 715b and 720b, the respective processing capacity of web application server 705 and backend database server 706, and the like. Thus, a finite number of connections allocated to high priority connections 715a and 720a and low priority connections 715b and 720b may be respectively defined that represent the maximum number of concurrent connections that may be supported thereby.

In accordance with a preferred embodiment of the present invention, connections may be dynamically reassigned

14

between connection priority classes to facilitate optimized utilization of network transmission capacity in a multi-tier network that services prioritized data transfers. In a preferred embodiment, a priority filter may define a maximum number of connections on a priority basis. For example, a maximum number of connections concurrently sustainable over high priority connections 715a and a maximum number of connections concurrently sustainable over low priority connections 715b may be defined in priority filter 730 run by web server 704 and in priority filter 731 run by web application server 705. Likewise, a maximum number of connections concurrently sustainable over high priority connections 720a and a maximum number of connections concurrently sustainable over low priority connections 720b may be defined in priority filter 731 run by web application server 705 and in backend database server filter 707.

As referred to herein, a maximum number of connections that may be sustained over a common priority set of connections is referred to as the connections capacity. In accordance with a preferred embodiment of the present invention, a portion of a capacity of connections of a first priority may be reassigned to the capacity of connections of another priority to facilitate optimized network transmission capacity in a multi-tier network system. For example, if the number of high priority connections being utilized for transaction transmissions exceeds a saturation threshold that is a predefined portion of the total available high priority connections, an attempt may be made to reassign a subset of the low priority connections to the high priority connections. Reassignment of the subset of low priority connections to the high priority connections is preferably contingent on the number of low priority connections being utilized for low priority data transmissions being below an idle threshold that is a predefined portion of the total available low priority connections. That is, reassignment of a portion of the low priority connections capacity may be made if sufficient low priority connection capacity is idle or not in use. Thus, in the event that the amount of high priority data being transferred over the high priority connections is approaching the capacity of the high priority connections, the capacity of the high priority connections may be increased by reassigning connections designated as low priority to the high priority connections pool. Reassignment of the low priority connections to the high priority connections may be made, for example, by re-designating a subset of the low priority connections as high priority connections.

With reference now to FIG. 9A, a diagrammatic illustration of a priority filter, or a module thereof, that facilitates dynamic reassignment of connection capacities between connection priority classes is shown in accordance with a preferred embodiment of the present invention. Priority filter 950 is preferably implemented as a set of computer-readable instructions and may be implemented in, or interface with, a network stack of the host server running priority filter 950. Priority filter 950 is an example of a priority filter, such as priority filter 730 shown in FIGS. 7A and 7B, run by a network node that terminates a network connection.

In the present example, priority filter 950 is run by a server that has two network addresses through which connections may be made with another network node. Particularly, priority filter 950 is illustrative of a priority filter run by web server 704 shown in FIG. 7 that establishes connections with web application server 705. In the illustrative example, priority filter 950 is implemented as a table having records 951 and 952 that respectively define two IP addresses 9.3.194.7 and 9.3.194.9 through which the network node running priority filter 950 establishes respective high and low priority connec-

US 7,460,558 B2

15

tions 715a and 715b with web application server 705. Additionally, capacities of the connections established are defined in records 951 and 952. In the illustrative example, record 951 of filter 950 defines a priority class of HI for data transactions to be transmitted on connections having a source address of 9.3.194.7, and record 952 of filter 950 defines a priority class of LO for data transactions to be transmitted on connections having a source address of 9.3.194.9. In the filter configuration depicted in FIG. 9A, each of the high priority connections and low priority connections are respectively allocated a connection capacity of 100. In general, the connection capacity allocated to high priority connections and low priority connections comprises subsets or partitions of an overall transmission capacity of the network node running priority filter 950. The connection capacity may, for example, comprise a number of connections in a connection pool, logical channels on a connection medium, or the like. Thus, in the configuration shown, each of the high priority connections and low priority connections have equal capacity for transmission of respective data of high and low priority classes.

In accordance with a preferred embodiment of the present invention, capacity of one connection priority class may be reassigned to another connection priority class. Reassignment may be made, for example, on identification of predefined network metrics, such as traffic loads identified on respective high and low priority connections. For example, assume a large number of high priority clients relative to low priority clients are connecting with web server 704. Thus, the high priority connections terminated at source address 9.3.194.7 will experience a relatively high load, and low priority connections terminated at source address 9.3.194.9 will experiencing a relatively low load. In such a situation, capacity of the low priority connections is dynamically reassigned to the high priority connections.

FIG. 9B is a diagrammatic illustration of priority filter 950 shown in FIG. 9A after reassignment of connection capacity from the low priority connection priority class to the high priority connection priority class. In the illustrative example, half (50) the original connection capacity (100) has been reassigned from the low priority connections to the high priority connections resulting in a high priority connection capacity of 150 and a low priority connections capacity of 50. Preferably, the priority filter includes, or interfaces with, a traffic evaluation module that monitors the connection priorities of clients requesting connection with web server 704. For example, priority filter 730 may include a module for accumulating traffic metrics that indicate the relative loads of high and low priority clients.

To facilitate connection capacity reassignment, the reassignment is propagated to each node in the multi-tier network. For example, on detection of a traffic condition that results in web server 704 reassigning low priority connection capacity to the high priority connection capacity, web server 704 issues a reassignment command to web application server 705 directing web application server 705 to configure the termination of high priority connections 715a and low priority connections 715b according to the capacity reassignment. In the example provided above with reference to FIGS. 9A and 9B, web server 704 would issue a reassignment directive to web application server 705 that directs web application server 705 to increase the capacity of high priority connections terminated at web application server high priority address 9.3.192.7 by 50 connections, and to reduce the capacity of low priority connections terminated at web application server low priority address 9.3.192.9 by 50 connections.

16

In a similar manner, web application server 705 increases the capacity of high priority connections 720a and decreases the capacity of low priority connections 720b that interconnect web application server 705 with backend database server 706. Reassignment of capacity of low priority connections 720b to high priority connections 720a is preferably performed in corresponding proportion to the reassignment made between web server 704 and web application server 705. In a like manner, web application server 705 issues a directive to backend database server 706 to configure the termination of high priority connections 720a and low priority connections 720b according to the reassignment made at web application server 705. Thus, the connection capacity reassignment invoked at web server 704 in response to traffic conditions detected thereby is propagated through intervening nodes and to the backend database server 706.

FIG. 9C is a diagrammatic illustration of web server 704, web application server 705 and backend database server 706 and connections therebetween prior to reassignment of connection capacity. In the illustrative example, dashed lines in connections 715a-715b and 720a-720b are each representative of a connection capacity of 50. Accordingly, each of the high priority connections 715 and 720 are configured with a connection capacity of 100. After the exemplary reassignment described above, a connection capacity of 50 has been reassigned from low priority connection 715b to high priority connection 715a, and from low priority connection 720b to high priority connection 720a as diagrammatically illustrated in FIG. 9D.

With reference now to FIG. 10, a flowchart of a connection priority reassignment routine for reassigning connections between different priority classes is shown in accordance with a preferred embodiment of the present invention. The connection priority reassignment routine depicted in FIG. 10 is preferably implemented as computer-readable instructions implemented as, or that interface with, a priority filter that is processed by a data processing system, such as web server 704 shown in FIG. 7, in a multi-tier network system.

The connection priority reassignment routine begins, for example on system boot or on invocation by a user such as a system administrator, and measures the high priority connections load (step 1002). The high priority connections load may be determined as a current number of connections being used on high priority connections, such as high priority connections 715a shown in FIG. 7, a measure of the number of high priority client requests received over a predefined interval at web sever 704, or by another suitable mechanism for identifying prioritized traffic loads. Alternatively, the high priority connections load may be a count of the number of high priority clients that have entered into an SLA with an administrator of web server 704.

The high priority connections load is then compared with a saturation threshold (step 1004). The saturation threshold is a value that defines a high priority connection load level at which an attempt to add additional high priority connection capacity from another connection priority level is to be made. If the high priority connection load does not exceed the saturation threshold, the connection priority reassignment routine cycle then ends (step 1016). If, however, it is determined that the high priority connection load level exceeds the saturation threshold, the low priority connections load is measured (step 1006). Measurement of the low priority connections load may be made, for example, by reading a current load of the low priority connections, measuring an average load of the low priority connections over a predefined interval, a count of the number of clients that have a low priority SLA serviced by web server 704, or by another suitable mechanism.

US 7,460,558 B2

17

The low priority connections load is then compared with an idle threshold (step **1008**). The idle threshold is a value that defines a low priority connection load level below which capacity of the low priority connections may be reassigned to the high priority connections without unduly impacting transmission performance of the low priority connections. For example, the idle threshold may be defined as fifty percent of the overall low priority connections capacity. Thus if the current level of the low priority connections is less than fifty percent of the low priority connections capacity, a portion of the low priority connections capacity may be reassigned to the high priority connections.

If it is determined that the low priority connections load is not less than the idle threshold at step **1008**, the connection priority reassignment routine then evaluates whether the resource limits of the high priority connections have been reached (step **1009**). If the resource limits on the high priority connections have been reached, the connection priority reassignment routine then ends according to step **1016**. If it is determined that the resource limits have not been reached at step **1009**, additional capacity that has not been assigned to any connection priority level is added to the high priority connections (step **1011**). An evaluation is then made to determine if there is an additional downstream node (step **1013**). If there is no downstream node, the connection priority reassignment routine cycle then ends according to step **1016**. If a downstream node exists, a directive to add additional capacity to the high priority connections is issued to the downstream node (step **1015**), and the connection priority reassignment routine cycle then ends according to step **1016**.

Returning again to step **1008**, if the low priority connections load is determined to be less than the idle threshold at step **1008**, the connection priority reassignment routine cycle then reassigns a portion of the low priority connections capacity to the high priority connections capacity (step **1010**). An evaluation is then made to determine if there is another downstream node to be reconfigured according to the connection capacity reassignment (step **1012**). If no downstream node exists, the connection priority reassignment routine cycle then ends according to step **1016**. If it is determined that a downstream node exists at step **1012**, the node issues a directive to the downstream node that directs the downstream node to reconfigure the connections according to the connection capacity reassignment (step **1014**), and the connection priority reassignment routine cycle then ends according to step **1016**.

With reference now to FIG. **11**, a flowchart of a connection priority reallocation routine for reallocating connection capacity previously reassigned to another connection priority class is shown in accordance with a preferred embodiment of the present invention. The connection priority reallocation routine depicted in FIG. **11** is preferably implemented as computer-readable instructions implemented as, or that interface with, a priority filter that is processed by a data processing system, such as web server **704** shown in FIG. **7**, in a multi-tier network system.

The connection priority reallocation routine begins, for example on system boot or on invocation by a user such as a system administrator, and evaluates whether any low priority connection capacity has previously been reassigned to the high priority connection capacity (step **1102**). If no low priority connection capacity has been previously reassigned to the high priority connections capacity, the connection priority reallocation routine cycle then ends (step **1114**). If it is determined that any low priority connections capacity has previously been reassigned to the high priority connections capacity, a measurement of the low priority connections load is made (step **1104**).

18

ously been reassigned to the high priority connections capacity, a measurement of the low priority connections load is made (step **1104**).

An evaluation is then made to determine if the low priority connections exceeds a minimum spare capacity threshold (step **1106**). As referred to herein, the minimum spare capacity threshold defines a low priority connection load level at which previously reassigned low priority connections capacity (or a portion thereof) is to be reallocated to the low priority connections capacity. If the low priority connections load does not exceed the minimum spare capacity threshold, the connection priority reallocation routine cycle then ends according to step **1114**. If it is determined that the low priority connections load exceeds the minimum spare capacity threshold at step **1106**, the low priority connections capacity (or a portion thereof) that was previously reassigned to the high priority connections capacity is reallocated to the low priority connections capacity (step **1108**). An evaluation is then made to determine if there is another downstream node to be reconfigured according to the connection capacity reallocation (step **1110**). If no downstream node exists, the connection priority reallocation routine cycle then ends according to step **1114**. If it is determined that a downstream node exists at step **1110**, the node issues a directive to the downstream node that directs the downstream node to reconfigure the connections according to the connection capacity reallocation (step **1112**), and the connection priority reassignment routine cycle then ends according to step **1114**.

As described, the present invention provides mechanisms for reassigning connection capacity from one priority class to another priority class to facilitate optimized utilization of transmission capacity in a multi-tier network. As the capacity of connections of one priority class approaches saturation, spare capacity may be reassigned from another class to the priority class approaching saturation, and connection capacity reassignment is propagated through the multi-tier network. Additionally, mechanisms for reallocating connection capacity that was previously reassigned to connections of a priority class from which the capacity was originally reassigned is provided. Accordingly, the overall network capacity is more effectively utilized.

It is important to note that while the present invention has been described in the context of a fully functioning data processing system, those of ordinary skill in the art will appreciate that the processes of the present invention are capable of being distributed in the form of a computer readable medium of instructions and a variety of forms and that the present invention applies equally regardless of the particular type of signal bearing media actually used to carry out the distribution. Examples of computer readable media include recordable-type media, such as a floppy disk, a hard disk drive, a RAM, CD-ROMs, DVD-ROMs, and transmission-type media, such as digital and analog communications links, wired or wireless communications links using transmission forms, such as, for example, radio frequency and light wave transmissions. The computer readable media may take the form of coded formats that are decoded for actual use in a particular data processing system.

The description of the present invention has been presented for purposes of illustration and description, and is not intended to be exhaustive or limited to the invention in the form disclosed. Many modifications and variations will be apparent to those of ordinary skill in the art. The embodiment was chosen and described in order to best explain the principles of the invention, the practical application, and to enable others of ordinary skill in the art to understand the invention

EXHIBIT D

-89-

US 7,460,558 B2

19 20

for various embodiments with various modifications as are suited to the particular use contemplated.

What is claimed is:

1. A method of reassigning connection capacity between prioritized connection classes in a multi-tiered network system, the method comprising the computer implemented steps of:

allocating a first transmission capacity to connections of a first priority class terminated by a first node and a second node in the network;

allocating a second transmission capacity to connections of a second priority class terminated by the first node and the second node;

identifying a first traffic load of the first priority class that exceeds a predefined threshold; responsive to identifying the first traffic load, reassigning a portion of the second transmission capacity to the first priority class; and

responsive to reassigning the portion, directing a third node to reassign a portion of a transmission capacity of connections of the second priority class terminated by the third node to connections of the first priority class terminated by the third node.

2. The method of claim 1, wherein identifying the first traffic load comprises measuring the traffic load of the connections of the first priority class terminated by the first node and the second node.

3. The method of claim 1, further comprising:

comparing the first traffic load with the predefined threshold, wherein the predefined threshold specifies a value of the first traffic load at which capacity of another priority class may be reassigned to the first priority class.

4. The method of claim 3, wherein reassigning the portion is performed responsive to determining the first traffic load exceeds the predefined threshold.

5. The method of claim 1, further comprising:

identifying a traffic load of the connections of the second priority class terminated by the first node and the second node; and

comparing the traffic load of the connections of the second priority class terminated by the first node and the second node with a second predefined threshold, wherein the second predefined threshold specifies a value of the second traffic load at which a portion of the second transmission capacity may be reassigned to another priority class.

6. The method of claim 5, wherein reassigning the portion is performed responsive to determining the traffic load of the connections of the second priority class terminated by the first node and the second node is less than the second predefined threshold.

7. The method of claim 1, further comprising:

identifying a traffic load of the connections of the second priority class terminated by the first node and the second node; and

comparing the traffic load of the connections of the second priority class terminated by the first node and the second node with a second predefined threshold, wherein the second predefined threshold specifies a value of the second traffic load at which the portion is to be reallocated from the connections of the first priority class terminated by the first node and the second node to the connections of the second priority class terminated by the first node and the second node.

8. A computer readable recordable medium encoded with computer executable instructions for reassigning connection capacity between prioritized connection classes in a multi-tier network system, the computer executable instructions comprising:

first instructions that allocate a first transmission capacity to connections of a first priority class terminated by a first node and a second node in the network;

second instructions that allocate a second transmission capacity to connections of a second priority class terminated by the first node and the second node;

third instructions that identify a first traffic load of the first priority class that exceeds a predefined threshold;

fourth instructions that, responsive to the third instructions identifying the first traffic load, reassign a portion of the second transmission capacity to the first priority class; and

responsive to reassigning the portion, directing a third node to reassign a portion of a transmission capacity of connections of the second priority class terminated by the third node to connections of the first priority class terminated by the third node.

9. The computer readable recordable medium of claim 8, wherein the third instructions measure the traffic load of the connections of the first priority class terminated by the first node and the second node.

10. The computer readable recordable medium of claim 8, further comprising:

fifth instructions that compare the first traffic load with the predefined threshold, wherein the predefined threshold specifies a value of the first traffic load at which capacity of another priority class may be reassigned to the first priority class.

11. The computer readable recordable medium of claim 10, wherein the fourth instructions reassign the portion in response to the fifth instructions determining the first traffic load exceeds the predefined threshold.

12. The computer readable recordable medium of claim 8, further comprising:

fifth instructions that identify a traffic load of the connections of the second priority class terminated by the first node and the second node; and

sixth instructions that compare the traffic load of the connections of the second priority class terminated by the first node and the second node with a second predefined threshold, wherein the second predefined threshold specifies a value of the second traffic load at which a portion of the second transmission capacity may be reassigned to another priority class.

13. The computer readable recordable medium of claim 12, wherein the fourth instructions reassign the portion responsive to the sixth instructions determining the traffic load of the connections of the second priority class terminated by the first node and the second node is less than the second predefined threshold.

14. The computer readable recordable medium of claim 8, further comprising:

fifth instructions that identify a traffic load of the connections of the second priority class terminated by the first node and the second node; and

sixth instructions that compare the traffic load of the connections of the second priority class terminated by the first node and the second node with a second predefined threshold, wherein the second predefined threshold specifies a value of the second traffic load at which the portion is to be reallocated from the connections of the first priority class terminated by the first node and the second node to the connections of the second priority class terminated by the first node and the second node.

EXHIBIT D

US 7,460,558 B2

21

22

15. A data processing system for reassigning connection capacity between prioritized connection classes in a network system, comprising:

    a communication interface connected with a communication medium, wherein the communication interface has a transmission capacity partitioned into a first transmission capacity of a first priority and a second transmission capacity of a second priority;

    a memory that contains a set of instructions for reassigning connection capacities between the first priority and the second priority; and

    a processing unit that, responsive to execution of the set of instructions, allocates a first transmission capacity to connections of a first priority class terminated by a first node and a second node in the network; allocates a second transmission capacity to connections of a second priority class terminated by the first node and the second node; identifies a first traffic load of the first priority class that exceeds a predefined threshold; responsive to identifying the first traffic load, reassigns a portion of the second transmission capacity to the first priority class; and responsive to reassigning the portion, directs a third node to reassign a portion of a transmission capacity of connections of the second priority class terminated by the third node to connections of the first priority class terminated by the third node.

16. The data processing system of claim 15, wherein the processing unit reassigns the portion responsive to determining the traffic load exceeds the predefined threshold.

17. The data processing system of claim 15, wherein the processing unit, responsive to execution of the set of instructions, identifies a traffic load of the second priority class and compares the traffic load of the second priority class with a second predefined threshold, wherein the second predefined threshold specifies a value of the traffic load of the second priority class at which a portion of the second transmission capacity may be reassigned to another priority class.

18. The data processing system of claim 17, wherein the processing unit reassigns the portion responsive to determining the traffic load of the second priority class is less than the second predefined threshold.

19. The data processing system of claim 15, wherein the processing unit, responsive to execution of the set of instructions, identifies a traffic load of the second priority class and compares the traffic load of the second priority class with a second predefined threshold, wherein the second predefined threshold specifies a value of the second traffic load at which the portion is to be reallocated from the first priority class to the second priority class.

20. The data processing system of claim 15, wherein the first transmission capacity is allocated to a connection pool that is a first subset of the connections available on the communication medium, and the second transmission capacity is allocated to a connection pool that is a second subset of the connections available on the communication medium.

\* \* \* \* \*

EXHIBIT D

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Jean P. Rosenbluth.

The case number on all documents filed with the Court should read as follows:

## SACV13- 254 CJC  (JPRx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |
|---|---|---|

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

MATTHEW P. LEWIS (SBN: 155516)
WHITE & CASE LLP
633 W. Fifth Street, Ste. 1900
Los Angeles, CA 90071-2007
Telephone: 213-620-7700
Facsimile: 213-452-2329

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| GOOGLE INC., | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | |
| v. | SACV13-254- CJC (JPRx) |
| BT AMERICAS, INC.; BT CONFERENCING, INC.; BT INS, INC.; and IPANEMA TECHNOLOGIES CORPORATION, | SUMMONS |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _Matthew P. Lewis_____, whose address is _White & Case LLP, 633 W. Fifth St., Ste. 1900, Los Angeles, CA  90071-2007_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: _FEB 1 3 2013_____

By: _Marily Stan_____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

---

CV-01A (10/11                                    **SUMMONS**

*conformed*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| GOOGLE INC. | BT AMERICAS, INC.; BT CONFERENCING, INC.; BT INS, INC., and IPANEMA TECHNOLOGIES CORPORATION |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Matthew Lewis<br>White & Case LLP, 633 West Fifth Street Suite 1900<br>Los Angeles, California, 90071-2007, (213) 620-7838 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes   ☑ No     ☐ **MONEY DEMANDED IN COMPLAINT: $_____**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Suit for patent infringement pursuant to 35 U.S.C. § 271

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☑ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☑ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 220 Foreclosure | IMMIGRATION | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | ☐ 290 All Other Real Property | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:   Case Number:** *SACV13-254*

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
　　　　　　　　　　　　　☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
　　　　　　　　　　　　　☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
　　　　　　　　　　　　　☐ D.  Involve the same patent, trademark or copyright, <u>and</u> one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Google Inc. - Santa Clara, CA |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| BT Americas, Inc. - Los Angeles, Ventura, and Santa Barbara; BT Conferencing, Inc. - Orange; BT INS, Inc. - Los Angeles and Orange; Ipanema Technologies Corporation - Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
　　Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles county | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):** _Matt P. Ferris_    Date February 13, 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |